# CALIFORNIA FEDERAL SAVINGS & LOAN ASSN. ET AL. *v.* GUERRA, DIRECTOR, DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, ET AL.

No. 85–494.  Argued October 8, 1986—Decided January 13, 1987

MARSHALL, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–B, III–C, and IV, in which BRENNAN, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined, and an opinion with respect to Part III–A, in which BRENNAN, BLACKMUN, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 292. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 295. WHITE, J., filed a dissenting opinion, in which REHNQUIST, C. J., and POWELL, J., joined, *post*, p. 297.

*Theodore B. Olson* argued the cause for petitioners. With him on the briefs were *Willard Z. Carr, Jr., Pamela L. Hemminger, Paul Blankenstein,* and *Jan E. Eakins.*

*Marian M. Johnston,* Deputy Attorney General of California, argued the cause for respondents. With her on the brief were *John K. Van de Kamp,* Attorney General, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, and *M. Anne Jennings* and *Beverly Tucker,* Deputy Attorneys General.*

JUSTICE MARSHALL delivered the opinion of the Court.

The question presented is whether Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, pre-empts a state statute that re-

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Geller, Deputy Assistant Attorney General Carvin, Richard J. Lazarus, Brian K. Landsberg, David K. Flynn,* and *Mary E. Mann;* and for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Lorence L. Kessler.*

Briefs of *amici curiae* urging affirmance were filed for the State of Connecticut et al. by *Joseph I. Lieberman,* Attorney General of Connecticut, *Clarine Nardi Riddle,* Deputy Attorney General, *Brian J. Comerford,* Assistant Attorney General, *Philip A. Murphy, Jr., Corinne K. A. Watanabe,* Attorney General of Hawaii, *Michael Greely,* Attorney General of Montana, and *Kenneth O. Eikenberry,* Attorney General of Washington; for the American Federation of Labor and Congress of Industrial Organizations by *Laurence Gold* and *Marsha S. Berzon;* for California Women Lawyers et al. by *Cheryl Houser, Janet M. Koehn,* and *Lorraine L. Loder;* for Equal Rights Advocates et al. by *Judith E. Kurtz, Nancy L. Davis,* and *Herma Hill Kay;* for Human Rights Advocates et al. by *Richard F. Ziegler* and *Andrew Weissmann;* for the National Conference of State Legislatures et al. by *Benna Ruth Solomon, Todd D. Peterson,* and *Barbara E. Etkind;* and for Lillian Garland by *Joan M. Graff, Robert Barnes,* and *Patricia Shiu.*

Briefs of *amici curiae* were filed for the American Civil Liberties Union et al. by *Joan E. Bertin, Isabelle Katz Pinzler, George Kannar,* and *Charles S. Sims;* for the Chamber of Commerce of the United States by *Robin S. Conrad;* for the Coalition for Reproductive Equality in the Workplace et al. by *Christine Anne Littleton* and *Judith Resnik;* and for the National Organization for Women et al. by *Susan Deller Ross, Sarah E. Burns,* and *Wendy Webster Williams.*

quires employers to provide leave and reinstatement to employees disabled by pregnancy.

## I

California's Fair Employment and Housing Act (FEHA), Cal. Gov't Code Ann. § 12900 *et seq.* (West 1980 and Supp. 1986), is a comprehensive statute that prohibits discrimination in employment and housing. In September 1978, California amended the FEHA to proscribe certain forms of employment discrimination on the basis of pregnancy. See Cal. Labor Code Ann. § 1420.35, 1978 Cal. Stats., ch. 1321, § 1, pp. 4320–4322 (West Supp. 1979), now codified at Cal. Gov't Code Ann. § 12945(b)(2) (West 1980).[1] Subdivision (b)(2)—the provision at issue here—is the only portion of the statute that applies to employers subject to Title VII. See

---

[1] Section 12945(b)(2) provides, in relevant part:

"It shall be an unlawful employment practice unless based upon a bona fide occupational qualification:

. . . . .

"(b) For any employer to refuse to allow a female employee affected by pregnancy, childbirth, or related medical conditions . . . .

. . . . .

"(2) To take a leave on account of pregnancy for a reasonable period of time; provided, such period shall not exceed four months. . . . Reasonable period of time means that period during which the female employee is disabled on account of pregnancy, childbirth, or related medical conditions. . . .

"An employer may require any employee who plans to take a leave pursuant to this section to give reasonable notice of the date such leave shall commence and the estimated duration of such leave."

Originally, the statute was intended to reverse, as to California employers, the rule established by this Court's decision in *General Electric Co. v. Gilbert*, 429 U. S. 125 (1976). At the time, California law prohibited school districts from discriminating on the basis of pregnancy, see former Cal. Labor Code Ann. § 1420.2 (1977), now codified at Cal. Gov't Code Ann. § 12943 (West 1980). The first version of § 12945 simply imposed this requirement on all California employers with five or more employees. As a result of employer opposition, however, the measure was changed to its present form.

§ 12945(e).[2]  It requires these employers to provide female employees an unpaid pregnancy disability leave of up to four months.  Respondent Fair Employment and Housing Commission, the state agency authorized to interpret the FEHA,[3] has construed § 12945(b)(2) to require California employers to reinstate an employee returning from such pregnancy leave to the job she previously held, unless it is no longer available due to business necessity.  In the latter case, the employer must make a reasonable, good-faith effort to place the employee in a substantially similar job.[4]  The statute does not compel employers to provide *paid* leave to pregnant employees.  Accordingly, the only benefit pregnant workers actually derive from § 12945(b)(2) is a qualified right to reinstatement.

Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, also prohibits various forms of employment

---

[2] Aware that legislation on this subject was pending before Congress, the state legislature added the following section:

"In the event Congress enacts legislation amending Title VII of the Civil Rights Act of 1964 to prohibit sex discrimination on the basis of pregnancy, the provisions of this act, except paragraph (2) of subdivision (b) . . . shall be inapplicable to any employer subject to such federal law . . . ."  1978 Cal. Stats., ch. 1321, § 4, p. 4322.

When Congress passed the Pregnancy Discrimination Act of 1978, this section rendered the state law, except subdivision (b)(2), invalid as applied to all employers covered by Title VII.  California subsequently adopted subdivision (e), which provides:

"The provisions of this section, except paragraph (2) of subdivision (b), shall be inapplicable to any employer subject to Title VII of the federal Civil Rights Act of 1964."

[3] See Cal. Gov't Code Ann. §§ 12935(a)(1) and 12935(h) (West 1980). Respondent Department of Fair Employment and Housing is the state agency charged with enforcing the FEHA.   See § 12930.

[4] The parties have stipulated that the Commission's interpretation of § 12945(b)(2) is set forth in its proposed regulation as reproduced in App. 47.   See also *Matter of Accusation of Department of Fair Employment and Housing* v. *Travel Express,* Case No. FEP 80–81 A7–0992s N18709 83–17 (Aug. 4, 1983) (precedential Commission decision construing § 12945 (b)(2)).

discrimination, including discrimination on the basis of sex. However, in *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976), this Court ruled that discrimination on the basis of pregnancy was not sex discrimination under Title VII.[5] In response to the *Gilbert* decision, Congress passed the Pregnancy Discrimination Act of 1978 (PDA), 42 U. S. C. § 2000e(k). The PDA specifies that sex discrimination includes discrimination on the basis of pregnancy.[6]

---

[5] In *General Electric Co.* v. *Gilbert*, the Court held that an otherwise comprehensive disability insurance plan did not violate Title VII because it failed to cover pregnancy-related disabilities. Relying on *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), which upheld a similar plan against a Fourteenth Amendment equal protection challenge, the Court concluded that removing pregnancy from the list of compensable disabilities was not discrimination on the basis of sex. 429 U. S., at 133–136. The Court further held that "[a]s there is no proof that the package is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme . . . ." *Id.*, at 138.

Three Members of the Court dissented. See *id.*, at 146 (opinion of BRENNAN, J., joined by MARSHALL, J.); *id.*, at 160 (opinion of STEVENS, J.). The dissenting Justices would have held that the employer's disability plan discriminated on the basis of sex by giving men protection for all categories of risk but giving women only partial protection.

In *Nashville Gas Co.* v. *Satty*, 434 U. S. 136, 143–146 (1977), the Court relied on *Gilbert* to uphold an employer's sick-leave policy that excluded pregnancy.

[6] The PDA added subsection (k) to § 701, the definitional section of Title VII. Subsection (k) provides, in relevant part:

"The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise."

The legislative history of the PDA reflects Congress' approval of the views of the dissenters in *Gilbert*. See *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 678–679, and nn. 15–17 (1983) (citing legislative history).

## II

Petitioner California Federal Savings & Loan Association (Cal Fed) is a federally chartered savings and loan association based in Los Angeles; it is an employer covered by both Title VII and § 12945(b)(2). Cal Fed has a facially neutral leave policy that permits employees who have completed three months of service to take unpaid leaves of absence for a variety of reasons, including disability and pregnancy. Although it is Cal Fed's policy to try to provide an employee taking unpaid leave with a similar position upon returning, Cal Fed expressly reserves the right to terminate an employee who has taken a leave of absence if a similar position is not available.

Lillian Garland was employed by Cal Fed as a receptionist for several years. In January 1982, she took a pregnancy disability leave. When she was able to return to work in April of that year, Garland notified Cal Fed, but was informed that her job had been filled and that there were no receptionist or similar positions available. Garland filed a complaint with respondent Department of Fair Employment and Housing, which issued an administrative accusation against Cal Fed on her behalf.[7] Respondent charged Cal Fed with violating § 12945(b)(2) of the FEHA. Prior to the scheduled hearing before respondent Fair Employment and Housing Commission, Cal Fed, joined by petitioners Merchants and Manufacturers Association and the California Chamber of Commerce,[8] brought this action in the United States District Court for the Central District of California.

---

[7] Cal Fed reinstated Garland in a receptionist position in November 1982, seven months after she first notified it that she was able to return to work.

[8] Petitioner Merchants and Manufacturers Association is a trade association that represents numerous employers throughout the State of California. Petitioner California Chamber of Commerce also represents many California businesses. Both organizations have members that are subject to both Title VII and § 12945(b)(2) and have disability-leave policies similar to Cal Fed's.

They sought a declaration that § 12945(b)(2) is inconsistent with and pre-empted by Title VII and an injunction against enforcement of the section.[9] The District Court granted petitioners' motion for summary judgment. 33 EPD ¶ 34,227, p. 32781, 34 FEP Cases 562 (1984). Citing *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC,* 462 U. S. 669 (1983),[10] the court stated that "California employers who comply with state law are subject to reverse discrimination suits under Title VII brought by temporarily disabled males who do not receive the same treatment as female employees disabled by pregnancy . . . ." 34 FEP Cases, at 568. On this basis, the District Court held that "California state law and the policies of interpretation and enforcement . . . which require preferential treatment of female employees disabled by pregnancy, childbirth, or related medical conditions are pre-empted by Title VII and are null, void, invalid and inoperative under the Supremacy Clause of the United States Constitution." *Ibid.*[11]

---

[9] Petitioners' complaint also alleged that the California disability-leave statute was pre-empted by § 514(a) of the Employee Retirement Income Security Act (ERISA), 29 U. S. C. § 1144(a). The parties stipulated that petitioners' ERISA claim would be dismissed without prejudice. App. 9–10, nn. 1, 2.

[10] In *Newport News,* the Court evaluated a health insurance plan that provided female employees with benefits for pregnancy-related conditions to the same extent as for other medical conditions, but provided less extensive pregnancy benefits for spouses of male employees. The Court found that this limitation discriminated against male employees with respect to the compensation, terms, conditions, or privileges of their employment in violation of § 703(a)(1) of Title VII. "The 1978 Act [the PDA] makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other conditions. Thus petitioner's plan unlawfully gives married male employees a benefit package for their dependents that is less inclusive than the dependency coverage provided to married female employees." 462 U. S., at 684.

[11] After the District Court entered its judgment, Garland moved to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2). The District Court denied her motion on several grounds: untimeliness, lack of a "direct and substantial" interest in the litigation, and adequate representation of

The United States Court of Appeals for the Ninth Circuit reversed. 758 F. 2d 390 (1985). It held that "the district court's conclusion that section 12945(b)(2) discriminates against men on the basis of pregnancy defies common sense, misinterprets case law, and flouts Title VII and the PDA." *Id.*, at 393 (footnote omitted). Based on its own reading of *Newport News*, the Court of Appeals found that the PDA does not "demand that state law be blind to pregnancy's existence." 758 F. 2d, at 395. The court held that in enacting the PDA Congress intended "to construct a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise." *Id.*, at 396. Because it found that the California statute furthers the goal of equal employment opportunity for women, the Court of Appeals concluded: "Title VII does not preempt a state law that guarantees pregnant women a certain number of pregnancy disability leave days, because this is neither inconsistent with, nor unlawful under, Title VII." *Ibid.*

We granted certiorari, 474 U. S. 1049 (1986), and we now affirm.

### III

### A

In determining whether a state statute is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. See *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95 (1983); *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504 (1978). Federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. *E. g., Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977). Second, congressional in-

---

her interests by defendants. Her appeal from the order denying intervention was consolidated with the appeal on the merits. In an unreported order, the Court of Appeals for the Ninth Circuit affirmed the denial of intervention; Garland did not seek review of that decision here.

tent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Neither of these bases for pre-emption exists in this case. Congress has explicitly disclaimed any intent categorically to pre-empt state law or to "occupy the field" of employment discrimination law. See 42 U. S. C. §§ 2000e–7 and 2000h–4.

As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See *Michigan Canners & Freezers Assn., Inc.* v. *Agricultural Marketing and Bargaining Bd.*, 467 U. S. 461, 478 (1984); *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 156 (1982). Nevertheless, pre-emption is not to be lightly presumed. See *Maryland* v. *Louisiana*, 451 U. S. 725, 746 (1981).

This third basis for pre-emption is at issue in this case. In two sections of the 1964 Civil Rights Act, §§ 708 and 1104, Congress has indicated that state laws will be pre-empted only if they actually conflict with federal law. Section 708 of Title VII provides:

"Nothing in this title shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment

practice under this title." 78 Stat. 262, 42 U. S. C. § 2000e–7.

Section 1104 of Title XI, applicable to all titles of the Civil Rights Act, establishes the following standard for pre-emption:

"Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof." 78 Stat. 268, 42 U. S. C. § 2000h–4.

Accordingly, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of Title VII; these two sections provide a "reliable indicium of congressional intent with respect to state authority" to regulate employment practice. *Malone* v. *White Motor Corp.*, *supra*, at 505.

Sections 708 and 1104 severely limit Title VII's preemptive effect. Instead of pre-empting state fair employment laws, § 708 "'simply left them where they were before the enactment of title VII.'" *Shaw* v. *Delta Air Lines, Inc.*, *supra*, at 103, n. 24 (quoting *Pervel Industries, Inc.* v. *Connecticut Comm'n on Human Rights and Opportunities*, 468 F. Supp. 490, 493 (Conn. 1978), affirmance order, 603 F. 2d 214 (CA2 1979), cert. denied, 444 U. S. 1031 (1980)). Similarly, § 1104 was intended primarily to "assert the intention of Congress to preserve existing civil rights laws." 110 Cong. Rec. 2788 (1964) (remarks of Rep. Meader). See also H. R. Rep. No. 914, 88th Cong., 1st Sess., 59 (1963) (additional views of Rep. Meader).[12] The narrow scope of pre-

---

[12] Representative Meader, one of the sponsors of the 1964 Civil Rights Act, proposed the precursor to § 1104 as an amendment to the Civil Rights Act, see 110 Cong. Rec. 2788 (1964), because he feared that § 708 and simi-

emption available under §§ 708 and 1104 reflects the importance Congress attached to state antidiscrimination laws in achieving Title VII's goal of equal employment opportunity. See generally *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S., at 101–102; *Kremer* v. *Chemical Construction Corp.*, 456 U. S. 461, 468–469, 472, 477 (1982); *New York Gaslight Club, Inc.* v. *Carey*, 447 U. S. 54, 63–65 (1980).[13]   The legislative history of the PDA also supports a narrow interpretation of these provisions,[14] as does our opinion in *Shaw* v. *Delta Air Lines, Inc., supra.*[15]

In order to decide whether the California statute requires or permits employers to violate Title VII, as amended by the PDA, or is inconsistent with the purposes of the statute, we

---

lar provisions in other titles were "wholly inadequate to preserve the validity and force of State laws aimed at discrimination." H. R. Rep. No. 914, 88th Cong., 1st Sess., 59 (1963) (additional views of Rep. Meader). His version provided that state laws would not be pre-empted "except to the extent that there is a direct and positive conflict between such provisions so that the two cannot be reconciled or consistently stand together." 110 Cong. Rec. 2787 (1964). The version ultimately adopted by Congress was a substitute offered by Representative Mathias without objection from Representative Meader. *Id.*, at 2789. There is no indication that this substitution altered the basic thrust of § 1104.

[13] For example, where state or local law prohibits an employment practice, § 706(c) requires deferral of federal enforcement until state or local officials have an opportunity "to act under such State or local law to remedy the practice alleged." § 2000e–5(d).

[14] See, *e. g.*, S. Rep. No. 95–331, p. 3, n. 1 (1977) (state laws prohibiting discrimination on the basis of pregnancy would not be pre-empted, "[s]ince title VII does not pre-empt State laws which would not require violating title VII"), Legislative History of the Pregnancy Discrimination Act of 1978, p. 40 (1980) (Committee Print prepared for the Senate Committee on Labor and Human Resources) (hereinafter Leg. Hist.); 123 Cong. Rec. 29643 (1977) (remarks of Sen. Williams) (state laws that create a "clear conflict" would be pre-empted).

[15] In *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S., at 100–104, we concluded that Title VII did not pre-empt a New York statute which proscribed discrimination on the basis of pregnancy as sex discrimination at a time when Title VII did not equate the two.

must determine whether the PDA prohibits the States from requiring employers to provide reinstatement to pregnant workers, regardless of their policy for disabled workers generally.

B

Petitioners argue that the language of the federal statute itself unambiguously rejects California's "special treatment" approach to pregnancy discrimination, thus rendering any resort to the legislative history unnecessary. They contend that the second clause of the PDA forbids an employer to treat pregnant employees any differently than other disabled employees. Because "'[t]he purpose of Congress is the ultimate touchstone'" of the pre-emption inquiry, *Malone* v. *White Motor Corp.*, 435 U. S., at 504 (quoting *Retail Clerks* v. *Schermerhorn*, 375 U. S. 96, 103 (1963)), however, we must examine the PDA's language against the background of its legislative history and historical context. As to the language of the PDA, "[i]t is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.'" *Steelworkers* v. *Weber*, 443 U. S. 193, 201 (1979) (quoting *Church of the Holy Trinity* v. *United States*, 143 U. S. 457, 459 (1892)). See *Train* v. *Colorado Public Interest Research Group, Inc.*, 426 U. S. 1, 10 (1976); *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543–544 (1940).

It is well established that the PDA was passed in reaction to this Court's decision in *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976). "When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S., at 678. By adding pregnancy to the definition of sex discrimination prohibited by Title VII, the first clause of the PDA reflects Congress' disapproval of the reasoning in *Gilbert*. *Newport News, supra,* at 678–679, and

n. 17 (citing legislative history). Rather than imposing a limitation on the remedial purpose of the PDA, we believe that the second clause was intended to overrule the holding in *Gilbert* and to illustrate how discrimination against pregnancy is to be remedied. Cf. 462 U. S., at 678, n. 14 ("The meaning of the first clause is not limited by the specific language in the second clause, which explains the application of the general principle to women employees"); see also *id.*, at 688 (REHNQUIST, J., dissenting).[16] Accordingly, subject to certain limitations,[17] we agree with the Court of Appeals' conclusion that Congress intended the PDA to be "a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise." 758 F. 2d, at 396.

The context in which Congress considered the issue of pregnancy discrimination supports this view of the PDA. Congress had before it extensive evidence of discrimination *against* pregnancy, particularly in disability and health insurance programs like those challenged in *Gilbert* and *Nashville Gas Co.* v. *Satty,* 434 U. S. 136 (1977).[18] The Reports, debates, and hearings make abundantly clear that Congress

---

[16] Several commentators have construed the second clause of the PDA in this way. See, *e. g.,* Note, Employment Equality Under The Pregnancy Discrimination Act of 1978, 94 Yale L. J. 929, 937 (1985); Note, Sexual Equality Under the Pregnancy Discrimination Act, 83 Colum. L. Rev. 690, 696, and n. 26 (1983).

[17] For example, a State could not mandate special treatment of pregnant workers based on stereotypes or generalizations about their needs and abilities. See *infra,* at 290.

[18] See Discrimination on the Basis of Pregnancy, 1977, Hearings on S. 995 before the Subcommittee on Labor of the Senate Committee on Human Resources, 95th Cong., 1st Sess., 31–33 (1977) (statement of Vice Chairman, Equal Employment Opportunity Commission, Ethel Bent Walsh); *id.,* at 113–117 (statement of Wendy W. Williams); *id.,* at 117–121 (statement of Susan Deller Ross); *id.,* at 307–310 (statement of Bella S. Abzug). See also Legislation to Prohibit Sex Discrimination on the Basis of Pregnancy, Hearings on H. R. 5055 and H. R. 6075 before the Subcommittee on Employment Opportunities of the House Committee on Education and Labor, 95th Cong., 1st Sess. (1977).

intended the PDA to provide relief for working women and to end discrimination against pregnant workers.[19]  In contrast to the thorough account of discrimination against pregnant workers, the legislative history is devoid of any discussion of preferential treatment of pregnancy,[20] beyond acknowledgments of the existence of state statutes providing for such preferential treatment.  See *infra,* at 287.  Opposition to the PDA came from those concerned with the cost of including pregnancy in health and disability-benefit plans and the application of the bill to abortion,[21] not from those who favored special accommodation of pregnancy.

In support of their argument that the PDA prohibits employment practices that favor pregnant women, petitioners and several *amici* cite statements in the legislative history to the effect that the PDA does not *require* employers to extend any benefits to pregnant women that they do not already provide to other disabled employees.  For example, the House Report explained that the proposed legislation "does not re-

---

[19] See, *e. g.,* 123 Cong. Rec. 8144 (1977) (remarks of Sen. Bayh) (legislation "will end employment discrimination against pregnant workers"); 124 Cong Rec. 21440 (1978) (remarks of Rep. Chisholm) (bill "affords some 41 percent of this Nation's labor force some greater degree of protection and security without fear of reprisal due to to their decision to bear children"); *id.,* at 21442 (remarks of Rep. Tsongas) (bill "would put an end to an unrealistic and unfair system that forces women to choose between family and career—clearly a function of sex bias in the law"); *id.,* at 36818 (remarks of Sen. Javits) (the "bill represents only basic fairness for women employees"); *id.,* at 38574 (remarks of Rep. Sarasin) (Subcommittee "learned of the many instances of discrimination against pregnant workers, as we learned of the hardships this discrimination brought to women and their families").

[20] The statement of Senator Brooke, quoted in the dissent, *post,* at 300, merely indicates the Senator's view that the PDA does not *itself* require special disability benefits for pregnant workers.  It in no way supports the conclusion that Congress intended to prohibit the *States* from providing such benefits for pregnant workers.  See n. 29, *infra.*

[21] See, *e. g.,* S. Rep. No. 95–331, p. 9 (1977), Leg. Hist. 46 (discussing cost objections); H. R. Conf. Rep. No. 95–1786, pp. 3–4 (1978), Leg. Hist. 196–197 (application of the PDA to abortion).

quire employers to treat pregnant employees in any particular manner. . . . H. R. 6075 in no way requires the institution of any new programs where none currently exist."[22] We do not interpret these references to support petitioners' construction of the statute. On the contrary, if Congress had intended to *prohibit* preferential treatment, it would have been the height of understatement to say only that the legislation would not *require* such conduct. It is hardly conceivable that Congress would have extensively discussed only its intent not to require preferential treatment if in fact it had intended to prohibit such treatment.

We also find it significant that Congress was aware of state laws similar to California's but apparently did not consider them inconsistent with the PDA. In the debates and Reports on the bill, Congress repeatedly acknowledged the existence of state antidiscrimination laws that prohibit sex discrimination on the basis of pregnancy.[23] Two of the States mentioned then required employers to provide reasonable leave to pregnant workers.[24] After citing these state laws,

---

[22] H. R. Rep. No. 95–948, p. 4 (1978), Leg. Hist. 150. See also S. Rep. No. 95–331, *supra*, at 4, Leg. Hist. 41; 123 Cong. Rec. 7540 (1977) (remarks of Sen. Williams); *id.*, at 10582 (remarks of Rep. Hawkins); *id.*, at 29387 (remarks of Sen. Javits); *id.*, at 29664 (remarks of Sen. Brooke).

[23] See, *e. g.*, *id.*, at 29387 (remarks of Sen. Javits), Leg. Hist. 67 ("[S]everal state legislatures . . . have chosen to address the problem by mandating certain types of benefits for pregnant employees"). See also S. Rep. No. 95–331, *supra*, at 3, Leg. Hist. 40; H. R. Rep. No. 95–948, *supra*, at 10–11, Leg. Hist. 156–157; 123 Cong. Rec. 29648 (1977) (list of States that require coverage for pregnancy and pregnancy-related disabilities); *id.*, at 29662 (remarks of Sen. Williams).

[24] See, *e. g.*, Conn. Gen. Stat. § 31–126(g) (1977), now codified at § 46a–60(a)(7) (1985); Mont. Rev. Codes § 41–2602 (Smith Supp. 1977), now codified at Mont. Code Ann. §§ 49–2–310 and 49–2–311 (1986). The Connecticut statute provided, in relevant part:

"It shall be an unfair employment practice

. . . . .

"(g) For an employer . . . (ii) to refuse to grant to [a pregnant] employee a reasonable leave of absence for disability resulting from such preg-

Congress failed to evince the requisite "clear and manifest purpose" to supersede them. See *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Comm'n,* 461 U. S. 190, 206 (1983). To the contrary, both the House and Senate Reports suggest that these laws would continue to have effect under the PDA.[25]

Title VII, as amended by the PDA, and California's pregnancy disability leave statute share a common goal. The purpose of Title VII is "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of . . . employees over other employees." *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 429–430 (1971). See *Hishon* v. *King & Spalding,* 467 U. S. 69, 75, n. 7 (1984); *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 763 (1976); *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 44 (1974); *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 800 (1973). Rather than limiting existing Title VII principles and objectives, the PDA extends

nancy. . . . (iii) Upon signifying her intent to return, such employee shall be reinstated to her original job or to an equivalent position with equivalent pay and accumulated seniority, retirement, fringe benefits and other service credits unless, in the case of a private employer, the employer's circumstances have so changed as to make it impossible or unreasonable to do so." Conn. Gen. Stat. § 31–126(g) (1977).

The Montana statute in effect in 1977 was virtually identical. Both have been recodified in current statutory compilations, but the leave and reinstatement requirements are unchanged. See also Mass. Gen. Laws § 149:105D (1985) (providing up to eight weeks maternity leave).

The dissent suggests that the references to the Connecticut and Montana statutes should be disregarded, because Congress did not expressly state that it understood that "these statutes required anything more than equal treatment." *Post,* at 301. However, we are not as willing as the dissent to impute ignorance to Congress. Where Congress has cited these statutes in the House and Senate Reports on the PDA, we think it fair to assume that it was aware of their substantive provisions.

[25] For example, the Senate Report states: "Since title VII does not preempt State laws which would not require violating title VII . . . , these States would continue to be able to enforce their State laws if the bill were enacted." S. Rep. No. 95–331, *supra,* at 3, n. 1, Leg. Hist. 40.

them to cover pregnancy.[26]   As Senator Williams, a sponsor of the Act, stated: "The entire thrust . . . behind this legislation is to guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life."   123 Cong. Rec. 29658 (1977).

Section 12945(b)(2) also promotes equal employment opportunity.   By requiring employers to reinstate women after a reasonable pregnancy disability leave, § 12945(b)(2) ensures that they will not lose their jobs on account of pregnancy disability.[27]   California's approach is consistent with the dissenting opinion of JUSTICE BRENNAN in *General Electric Co.* v. *Gilbert,* which Congress adopted in enacting the PDA.   Referring to *Lau* v. *Nichols,* 414 U. S. 563 (1974), a Title VI decision, JUSTICE BRENNAN stated:

> "[D]iscrimination is a social phenomenon encased in a social context and, therefore, unavoidably takes its meaning from the desired end products of the relevant legislative enactment, end products that may demand due consideration of the uniqueness of the 'disadvantaged' individuals.   A realistic understanding of conditions found in today's labor environment warrants taking pregnancy into account in fashioning disability policies."   429 U. S., at 159 (footnote omitted).

By "taking pregnancy into account," California's pregnancy disability-leave statute allows women, as well as men, to have families without losing their jobs.

---

[26] "Proponents of the bill repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that the amending legislation was necessary to reestablish the principles of Title VII law as they had been understood prior to the *Gilbert* decision."   *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC,* 462 U. S., at 679.

[27] As authoritatively construed by respondent Commission, the provision will "insure that women affected by pregnancy, childbirth or related medical conditions have equal employment opportunities as persons not so affected."   California Fair Employment and Housing Commission's Proposed Regulation, see App. 49.

We emphasize the limited nature of the benefits § 12945 (b)(2) provides. The statute is narrowly drawn to cover only the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions. Accordingly, unlike the protective labor legislation prevalent earlier in this century,[28] § 12945(b)(2) does not reflect archaic or stereotypical notions about pregnancy and the abilities of pregnant workers. A statute based on such stereotypical assumptions would, of course, be inconsistent with Title VII's goal of equal employment opportunity. See, *e. g., Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 709 (1978); *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542, 545 (1971) (MARSHALL, J., concurring).

## C

Moreover, even if we agreed with petitioners' construction of the PDA, we would nonetheless reject their argument that the California statute requires employers to violate Title VII.[29] Section 12945(b)(2) does not prevent employers from

---

[28] See generally B. Brown, A. Freedman, H. Katz, & A. Price, Women's Rights and the Law 209–210 (1977). In the constitutional context, we have invalidated on equal protection grounds statutes designed "to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior." *Mississippi University for Women* v. *Hogan*, 458 U. S. 718, 725 (1982).

[29] Petitioners assert that even if § 12945(b)(2) does not *require* employers to treat pregnant employees differently from other disabled employees, it *permits* employers to do so because it does not specifically prohibit different treatment. Of course, since the PDA does not itself prohibit different treatment, it certainly does not require the States to do so. Moreover, if we were to interpret the term "permit" as expansively as petitioners suggest, the State would be required to incorporate every prohibition contained in Title VII into its state law, since it would otherwise be held to "permit" any employer action it did not expressly prohibit. We conclude that "permit" in § 708 must be interpreted to pre-empt only those state laws that expressly *sanction* a practice unlawful under Title VII; the term does not pre-empt state laws that are silent on the practice.

complying with both the federal law (as petitioners construe it) and the state law. This is not a case where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S., at 142–143, or where there is an "inevitable collision between the two schemes of regulation." *Id.,* at 143.[30] Section 12945(b)(2) does not compel California employers to treat pregnant workers *better* than other disabled employees; it merely establishes benefits that employers must, at a minimum, provide to pregnant workers. Employers are free to give comparable benefits to other disabled employees, thereby treating "women affected by pregnancy" no better than "other persons not so affected but similar in their ability or inability to work." Indeed, at oral argument, petitioners conceded that compliance with both statutes "is theoretically possible." Tr. of Oral Arg. 6.

Petitioners argue that "extension" of the state statute to cover other employees would be inappropriate in the absence of a clear indication that this is what the California Legislature intended. They cite cases in which this Court has declined to rewrite underinclusive state statutes found to violate the Equal Protection Clause. See, *e. g., Wengler* v. *Druggists Mutual Insurance Co.,* 446 U. S. 142, 152–153 (1980); *Caban* v. *Mohammed,* 441 U. S. 380, 392–393, n. 13 (1979). This argument is beside the point. Extension is a remedial option to be exercised by a court once a statute is

---

[30] Indeed, Congress and the California Legislature were each aware in general terms of the regulatory scheme adopted by the other when they enacted their legislation. California recognized that many of its provisions would be pre-empted by the PDA and, accordingly, exempted employers covered by Title VII from all portions of the statute except those guaranteeing unpaid leave and reinstatement to pregnant workers. Congress was aware that some state laws mandated certain benefits for pregnant workers, but did not indicate that they would be pre-empted by federal law. See *supra,* at 287–288.

found to be invalid.[31]  See, *e. g., Califano* v. *Westcott,* 443 U. S. 76, 89 (1979) (quoting *Welsh* v. *United States,* 398 U. S. 333, 361 (1970) (Harlan, J., concurring in result)).

## IV

Thus, petitioners' facial challenge to § 12945(b)(2) fails. The statute is not pre-empted by Title VII, as amended by the PDA, because it is not inconsistent with the purposes of the federal statute, nor does it require the doing of an act which is unlawful under Title VII.[32]

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

The Pregnancy Discrimination Act of 1978 (PDA) does not exist in a vacuum. As JUSTICE WHITE recognizes in his dissent, Congress did not intend to "put pregnancy in a class by itself within Title VII," and the enactment of the PDA "did not mark a departure from Title VII principles." *Post,* at 298–299. But this realization does not lead me to support JUSTICE WHITE's position; rather, I believe that the PDA's posture as part of Title VII compels rejection of his argument that the PDA mandates complete neutrality and forbids all beneficial treatment of pregnancy.[1]

---

[31] We recognize that, *in cases where a state statute is otherwise invalid,* the Court must look to the intent of the state legislature to determine whether to extend benefits or nullify the statute. By arguing that extension would be inappropriate in this case, however, *post,* at 302–303, and citing this as a basis for pre-emption, the dissent simply ignores the prerequisite of invalidity.

[32] Because we conclude that in enacting the PDA Congress did not intend to prohibit all favorable treatment of pregnancy, we need not decide and therefore do not address the question whether § 12945(b)(2) could be upheld as a legislative response to leave policies that have a disparate impact on pregnant workers.

[1] Because I agree with the Court that the California statute does not conflict with the purposes of the PDA, and does not purport to "require or permit" action inconsistent with the PDA, I do not reach the question

In *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), the Court rejected the argument that Title VII prohibits all preferential treatment of the disadvantaged classes that the statute was enacted to protect. The plain words of Title VII, which would have led to a contrary result, were read in the context of the statute's enactment and its purposes.[2] In this case as well, the language of the Act seems to mandate treating preg-

---

whether § 1104 of the Civil Rights Act of 1964, 42 U. S. C. § 2000h–4, is applicable to Title VII, or whether, as JUSTICE SCALIA suggests, § 708, 42 U. S. C. § 2000e–7, is the only provision governing Title VII's pre-emptive scope. Even if § 1104 applies, the California statute would not be preempted in this case. Since Part III–A of JUSTICE MARSHALL's opinion does not make clear whether it decides this issue, or whether it only assumes for the purposes of the decision that § 1104 applies, I do not join that section. I do, however, join the remainder of the Court's opinion.

The choice between disposing of the case through interpreting the preemption provisions of Title VII and Title XI as JUSTICE SCALIA does, or through interpreting the substance of the PDA and thus obviating the need to decide the Title XI question, is a choice between two grounds of statutory construction. Neither approach is inherently narrower than the other. Given the value of having an opinion for the Court, I have therefore concluded that I should choose between the conflicting views of the PDA expressed by JUSTICE MARSHALL and JUSTICE WHITE, even though JUSTICE SCALIA may be correct in arguing that this case could be decided without reaching that issue.

[2] There is a striking similarity between the evidence about the enactment of Title VII that was available in *Steelworkers* v. *Weber* and the evidence available regarding the enactment of the PDA. First, the plain language in both cases points to neutrality, see *ante*, at 284; 443 U. S., at 201, although, if anything, that language was even less equivocal in *Weber* than it is here. See *ante*, at 285. Second, in both cases the records are replete with indications that Congress' goal was to bar discrimination against the disadvantaged class or classes at issue. See *ante*, at 285–286; 443 U. S., at 201–204. Third, in neither case was there persuasive evidence that Congress considered the ramifications of a rule mandating complete neutrality. See *ante*, at 286; 443 U. S., at 204. Finally, there were statements in the legislative histories of both provisions stressing that Congress did not intend to *require* preferential treatment, statements that undermine the conclusion that Congress indeed intended to *prohibit* such treatment. See *ante*, at 286; 443 U. S., at 204–206.

nant employees the same as other employees. I cannot, however, ignore the fact that the PDA is a definitional section of Title VII's prohibition against gender-based discrimination. Had *Weber* interpreted Title VII as requiring neutrality, I would agree with JUSTICE WHITE that the PDA should be interpreted that way as well. But since the Court in *Weber* interpreted Title VII to draw a distinction between discrimination *against* members of the protected class and special preference *in favor of* members of that class, I do not accept the proposition that the PDA requires absolute neutrality.

I therefore conclude that JUSTICE MARSHALL's view, which holds that the PDA allows some preferential treatment of pregnancy, is more consistent with our interpretation of Title VII than JUSTICE WHITE's view is. This is not to say, however, that all preferential treatment of pregnancy is automatically beyond the scope of the PDA.[3] Rather, as with other parts of Title VII, preferential treatment of the disadvantaged class is only permissible so long as it is consistent with "accomplish[ing] the goal that Congress designed Title VII to achieve." *Weber, supra*, at 204.[4] That goal has been

---

[3] I do not read the Court's opinion as holding that Title VII presents no limitations whatsoever on beneficial treatment of pregnancy. Although the opinion does make some mention of the "floor" but "not a ceiling" language employed by the Court of Appeals, see *ante*, at 285, the Court also points out that there are limitations on what an employer can do, even when affording "preferential" treatment to pregnancy. See *ante*, at 285, n. 17, 290. Indeed, the Court of Appeals also subjected California's statute to the test of "whether the policy furthers 'Title VII's prophylactic purpose of achieving "equality of employment opportunities."'" 758 F. 2d 390, 396 (1985) (quoting *EEOC* v. *Puget Sound Log Scaling & Grading Bureau*, 752 F. 2d 1389, 1392 (CA9 1985) (in turn quoting *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429 (1971))).

[4] The Court has not yet had occasion to explore the exact line of demarcation between permissible and impermissible preferential treatment under Title VII. The factors discussed in *Weber* are, in my view, merely exemplary, and do not necessarily define the outer limits of what a private employer or a State may do to in an attempt to effectuate the goals of Title VII.

characterized as seeking "to achieve equality of employment opportunities and to remove barriers that have operated in the past to favor an identifiable group of . . . employees over other employees." *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–430 (1971).

It is clear to me, as it is to the Court,[5] and was to the Court of Appeals,[6] that the California statute meets this test. Thus, I agree that a California employer would not violate the PDA were it to comply with California's statute without affording the same protection to men suffering somewhat similar disabilities.

JUSTICE SCALIA, concurring in the judgment.

The only provision of the Civil Rights Act of 1964 whose effect on pre-emption need be considered in the present case is § 708 of Title VII, 42 U. S. C. § 2000e–7. Although both that section and § 1104, 42 U. S. C. § 2000h–4, are described by the majority as pre-emption provisions, they are more precisely *antipre-emption* provisions, prescribing that nothing in Title VII (in the case of § 708) and nothing in the entire Civil Rights Act (in the case of § 1104) shall be deemed to pre-empt state law unless certain conditions are met. The exceptions set forth in the general § 1104 ban on pre-emption ("inconsisten[cy] with any of the purposes of this Act, or any provision thereof") are somewhat broader than the single exception set forth in the Title VII § 708 ban. Because the Pregnancy Disability Act (PDA) is part of Title VII, the more expansive prohibition of pre-emption particularly applicable to that Title applies. If that precludes pre-emption of Cal. Govt. Code Ann. § 12945(b)(2) (West 1980), it is unnecessary to inquire whether § 1104 would do so.

Section 708 narrows the pre-emptive scope of the PDA so that it pre-empts only laws which "purpor[t] to require or permit the doing of any act which would be an unlawful employ-

[5] See *ante*, at 289.
[6] 758 F. 2d, at 396.

ment practice" under the Title. 42 U. S. C. § 2000e–7. Thus, whether or not the PDA prohibits discriminatorily favorable disability treatment for pregnant women, § 12945(b)(2) of the California Code cannot be pre-empted, since it does not remotely purport to require or permit any refusal to accord federally mandated equal treatment to others similarly situated. No more is needed to decide this case.

The majority not only ignores the clear antipre-emptive effect of § 708, but, even proceeding on the basis of its more generalized pre-emption analysis, decides more than is necessary. Its reasoning is essentially as follows: It is consistent with the requirements and purposes of the PDA for a State to require special treatment for pregnancy disability (Part III–B); and besides, the state law here at issue does not require special treatment for pregnancy disability (Part III–C). By parity of analysis, we can decide any issue, so long as the facts before us either do or do not present it. There are proper occasions for alternative holdings, where one of the alternatives does not eliminate the jurisdictional predicate for the other—though even in that situation the practice is more appropriate for lower courts than for this Court, whose first arrow runs no risk of being later adjudged to have missed its mark. But where, as here, it is entirely clear that an issue of law is not presented by the facts of the case, it is beyond our jurisdiction to reach it.

I am fully aware that it is more convenient for the employers of California and the California Legislature to have us interpret the PDA prematurely. It has never been suggested, however, that the constitutional prohibition upon our rendering of advisory opinions is a doctrine of convenience. I would affirm the judgment of the Court of Appeals on the ground that § 12945(b)(2) of the California Code does not purport to require or permit any act that would be an unlawful employment practice under any conceivable interpretation of the PDA, and therefore, by virtue of § 708, cannot be pre-empted.

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE POWELL join, dissenting.

I disagree with the Court that Cal. Govt. Code Ann. § 12945(b)(2) (West 1980) is not pre-empted by the Pregnancy Discrimination Act of 1978 (PDA), 92 Stat. 2076, codified at 42 U. S. C. § 2000e(k), and § 708 of Title VII. Section 703(a) of Title VII, 78 Stat. 255, 42 U. S. C. § 2000e–2(a), forbids discrimination in the terms of employment on the basis of race, color, religion, sex, or national origin. The PDA gave added meaning to discrimination on the basis of sex:

> "The terms 'because of sex' or 'on the basis of sex' [in § 703(a) of this Title] include, but are not limited to, because of or on the basis of pregnancy, childbirth or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . ." §'2000e(k).

The second clause quoted above could not be clearer: it mandates that pregnant employees "shall be treated the same for all employment-related purposes" as nonpregnant employees similarly situated with respect to their ability or inability to work. This language leaves no room for preferential treatment of pregnant workers. The majority would avoid its plain meaning by misapplying our interpretation of the clause in *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 678, n. 14 (1983). *Ante,* at 285. The second clause addresses only female employees and was not directly implicated in *Newport News* because the pregnant persons at issue in that case were spouses of male employees. We therefore stated in *Newport News* that the second clause had only explanatory or illustrative significance. We did not indicate in any way, however, that the

second clause does not mean exactly what it says in a situation where it is directly implicated.

Contrary to the mandate of the PDA, California law requires every employer to have a disability leave policy for pregnancy even if it has none for any other disability. An employer complies with California law if it has a leave policy for pregnancy but denies it for every other disability. On its face, § 12945(b)(2) is in square conflict with the PDA and is therefore pre-empted. Because the California law permits employers to single out pregnancy for preferential treatment and therefore to violate Title VII, it is not saved by § 708 which limits pre-emption of state laws to those that require or permit an employer to commit an unfair employment practice.[1]

The majority nevertheless would save the California law on two grounds. First, it holds that the PDA does not require disability from pregnancy to be treated the same as other disabilities; instead, it forbids less favorable, but permits more favorable, benefits for pregnancy disability. The express command of the PDA is unambiguously to the contrary, and the legislative history casts no doubt on that mandate.

The legislative materials reveal Congress' plain intent not to put pregnancy in a class by itself within Title VII, as the majority does with its "floor . . . not a ceiling" approach. *Ante*, at 285. The Senate Report clearly stated:

"By defining sex discrimination to include discrimination against pregnant women, the bill rejects the view that employers may treat pregnancy and its incidents as *sui generis*, without regard to its functional comparability to other conditions. Under this bill, the treatment of

---

[1] The same clear language preventing preferential treatment based on pregnancy forecloses respondents' argument that the California provision can be upheld as a legislative response to leave policies that have a disparate impact on pregnant workers. Whatever remedies Title VII would otherwise provide for victims of disparate impact, Congress expressly ordered pregnancy to be treated in the same manner as other disabilities.

pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working."[2]

The House Report similarly stressed that the legislation did not mark a departure from Title VII principles:

"It must be emphasized that this legislation, *operating as part of Title VII*, prohibits only discriminatory treatment. Therefore, it does not require employers to treat pregnant employees in any particular manner with respect to hiring, permitting them to continue working, providing sick leave, furnishing medical and hospital benefits, providing disability benefits, or any other matter. H. R. 6075 in no way requires the institution of any new programs where none currently exist. The bill would simply require that pregnant women be treated the same as other employees on the basis of their ability or inability to work."[3]

---

[2] S. Rep. No. 95–331, p. 4 (1977), Legislative History of the Pregnancy Discrimination Act of 1978 (Committee Print prepared for the Senate Committee on Labor and Human Resources), p. 41 (1980) (Leg. Hist.).

[3] H. R. Rep. No. 95–948, p. 4 (1978), Leg. Hist. 150 (emphasis added). The same theme was also expressed repeatedly in the floor debates. Senator Williams, for example, the Chairman of the Senate Committee on Labor and Human Resources and a sponsor of the Senate bill, described the bill as follows in his introduction of the bill to the Senate:

"The central purpose of the bill is to require that women workers be treated equally with other employees on the basis of their ability or inability to work. The key to compliance in every case will be equality of treatment. In this way, the law will protect women from the full range of discriminatory practices which have adversely affected their status in the work force." 123 Cong. Rec. 29385 (1977), Leg. Hist. 62–63.

The majority correctly reports that Congress focused on discrimination against, rather than preferential treatment of, pregnant workers. There is only one direct reference in the legislative history to preferential treatment. Senator Brooke stated during the Senate debate: "I would emphasize most strongly that S. 995 in no way provides special disability benefits for working women. They have not demanded, nor asked, for such benefits. They have asked only to be treated with fairness, to be accorded the same employment rights as men."[4] Given the evidence before Congress of the widespread discrimination against pregnant workers, it is probable that most Members of Congress did not seriously consider the possibility that someone would want to afford preferential treatment to pregnant workers. The parties and their *amici* argued vigorously to this Court the policy implications of preferential treatment of pregnant workers. In favor of preferential treatment it was urged with conviction that preferential treatment merely enables women, like men, to have children without losing their jobs. In opposition to preferential treatment it was urged with equal conviction that preferential treatment represents a resurgence of the 19th-century protective legislation which perpetuated sex-role stereotypes and which impeded women in their efforts to take their rightful place in the workplace. See, *e. g.*, *Muller* v. *Oregon*, 208 U. S. 412, 421–423 (1908); *Bradwell* v. *Illinois*, 16 Wall. 130, 141 (1873) (Bradley, J., concurring). It is not the place of this Court, however, to resolve this policy dispute. Our task is to interpret Congress' intent in enacting the PDA. Congress' silence in its consideration of the PDA with respect to preferential treatment of pregnant workers cannot fairly be interpreted to abrogate the plain statements in the legislative history, not to mention the language of the statute, that equality of treatment was to be the guiding principle of the PDA.

---

[4] 123 Cong. Rec. 29664 (1977), Leg. Hist. 135.

Congress' acknowledgment of state antidiscrimination laws does not support a contrary inference. *Ante*, at 287–288. The most extensive discussion of state laws governing pregnancy discrimination is found in the House Report.[5] It was reported that six States, Alaska, Connecticut, Maryland, Minnesota, Oregon, and Montana, and the District of Columbia specifically included pregnancy in their fair employment practices laws. In 12 additional States, Illinois, Indiana, Iowa, Kansas, Massachusetts, Michigan, Missouri, New York, Pennsylvania, South Dakota, Washington, and Wisconsin, the prohibition on sex discrimination in the state fair employment practices law had been interpreted, either by a state court or the state enforcement agency, to require equal treatment of pregnant workers. Finally, five States, California, Hawaii, New Jersey, New York, and Rhode Island, had included pregnancy in their temporary disability laws under which private employers are required to provide partial wage replacement for temporary disabilities. The Report noted, however, that whereas California, New Jersey, and New York covered complications from pregnancy on the same basis as other disabilities, California, New Jersey, New York, and Rhode Island set maximum limits on the coverage required for disability associated with normal childbirth. The Report did not in any way set apart the Connecticut and Montana statutes, on which the majority relies, from the other state statutes. The House Report gave no indication that these statutes required anything more than equal treatment. Indeed, the state statutes were considered, not in the context of pre-emption, but in the context of a discussion of health insurance costs. The House Report expressly stated: "The significance of this State coverage" is that "many employers are *already* under a State law obligation to provide benefits to pregnant disabled workers. Passage of the bill thus has little or no economic impact on such employers."[6]

---

[5] H. R. Rep. No. 95–948, *supra*, at 10–11, Leg. Hist. 156–157.

[6] H. R. Rep. No. 95–948, *supra*, at 11, Leg. Hist. 157 (emphasis in original).

Nor does anything in the legislative history from the Senate side indicate that it carefully considered the state statutes, including those of Connecticut and Montana, and expressly endorsed their provisions. The Senate Report noted that "25 States presently interpret their own fair employment practices laws to prohibit sex discrimination based on pregnancy and childbirth," and Senator Williams presented during the Senate debate a list of States which required coverage for pregnancy and pregnancy-related disabilities, but there was no analysis of their provisions.[7] The majority seems to interpret Senator Javits' acknowledgment that several state legislatures, including New York, his own State, had mandated certain benefits for pregnant employees as an unqualified endorsement of those state statutes. *Ante*, at 287, n. 23. Later, however, when pressed by Senator Hatch about the fact that the New York statute limited the required coverage of disability caused by pregnancy to eight weeks, Senator Javits had no hesitation in expressing his disagreement with the New York statute.[8] Passing reference to state statutes without express recognition of their content and without express endorsement is insufficient in my view to override the PDA's clear equal-treatment mandate, expressed both in the statute and its legislative history.

The Court's second, and equally strange, ground is that even if the PDA does prohibit special benefits for pregnant women, an employer may still comply with both the California law and the PDA: it can adopt the specified leave policies for pregnancy and at the same time afford similar benefits for all other disabilities. This is untenable. California surely had no intent to require employers to provide general disability leave benefits. It intended to prefer pregnancy and went no further. Extension of these benefits to the entire work force would be a dramatic increase in the scope of the state

---

[7] S. Rep. No. 95–331, at 3, Leg. Hist. 40; 123 Cong. Rec. 29648 (1977), Leg. Hist. 91.

[8] 123 Cong. Rec. 29654–29655 (1977), Leg. Hist. 108–110.

law and would impose a significantly greater burden on California employers. That is the province of the California Legislature. See *Wengler* v. *Druggists Mutual Insurance Co.*, 446 U. S. 142, 152–153 (1980); *Caban* v. *Mohammed*, 441 U. S. 380, 392–393, n. 13 (1979); *Craig* v. *Boren*, 429 U. S. 190, 210, n. 24 (1976). Nor can § 12945(b)(2) be saved by applying Title VII in tandem with it, such that employers would be required to afford reinstatement rights to pregnant workers as a matter of state law but would be required to afford the same rights to all other workers as a matter of federal law. The text of the PDA does not speak to this question but it is clear from the legislative history that Congress did not intend for the PDA to impose such burdens on employers. As recognized by the majority, opposition to the PDA came from those concerned with the cost of including pregnancy in health and disability benefit plans. *Ante*, at 286. The House Report acknowledged these concerns and explained that the bill "in no way requires the institution of any new programs where none currently exist."[9] The Senate Report gave a similar assurance.[10] In addition, legislator after legislator stated during the floor debates that the PDA would not require an employer to institute a disability benefits program if it did not already have one in effect.[11] Congress intended employers to be free to

---

[9] H. R. Rep. No. 95–948, at 4, Leg. Hist. 150.

[10] S. Rep. No. 95–331, *supra*, at 4, Leg. Hist. 41.

[11] 123 Cong. Rec. 7541 (1977), Leg. Hist. 8 (remarks of Sen. Brooke) ("[T]he bill being introduced would not mandate compulsory disability coverage"); 123 Cong. Rec., at 8145, Leg. Hist. 19 (remarks of Sen. Bayh) ("Under the provisions of our legislation, only those companies which already voluntarily offer disability coverage would be affected"); 123 Cong. Rec., at 10582, Leg. Hist. 25 (remarks of Rep. Hawkins) ("[A]n employer who does not now provide disability benefits to his employees will not have to provide such benefits to women disabled due to pregnancy or childbirth"); 123 Cong. Rec., at 29386, Leg. Hist. 64 (remarks of Sen. Williams) ("[T]his legislation does not require that any employer begin to provide health insurance where it is not presently provided"); 123 Cong. Rec., at

provide any level of disability benefits they wished—or none at all—as long as pregnancy was not a factor in allocating such benefits. The conjunction of § 12945(b)(2) and the PDA requires California employers to implement new minimum disability leave programs. Reading the state and federal statutes together in this fashion yields a result which Congress expressly disavowed.

In sum, preferential treatment of pregnant workers is prohibited by Title VII, as amended by the PDA. Section 12945(b)(2) of the California Government Code, which extends preferential benefits for pregnancy, is therefore pre-empted. It is not saved by § 708 because it purports to authorize employers to commit an unfair employment practice forbidden by Title VII.[12]

---

29388, Leg. Hist. 71 (remarks of Sen. Kennedy) ("This amendment does not require all employers to provide disability insurance plans; it merely requires that employers who have disability plans for their employees treat pregnancy-related disabilities in the same fashion that all other temporary disabilities are treated with respect to benefits and leave policies"); 123 Cong. Rec., at 29663, Leg. Hist. 131 (remarks of Sen. Cranston) ("[S]ince the basic standard is comparability among employees, an employer who does not provide medical benefits at all, would not have to pay the medical costs of pregnancy or child birth"); 123 Cong. Rec., at 29663, Leg. Hist. 133 (remarks of Sen. Culver) ("The legislation before us today does not mandate compulsory disability coverage").

[12] Section 12945(b)(2) does not *require* employers to treat pregnant employees better than *other* disabled employees; employers are free voluntarily to extend the disability leave to all employees. But if this is not a statute which "purports to . . . permit the doing of any act which would be an unlawful employment practice" under Title VII, I do not know what such a statute would look like. See, *ante*, at 290, n. 29.

Neither is § 12945(b)(2) saved by § 1104 of the Civil Rights Act since it is inconsistent with the equal-treatment purpose and provisions of Title VII.