899 F.2d 1315
 58 USLW 2597, 1990-1 Trade Cases 68,972
 MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF the UNITED
STATES, INC., and Automobile Importers of America,
Inc., Plaintiffs-Appellees,
v.
Robert ABRAMS, Attorney General of the State of New York,
Defendant-Appellant.
 No. 886, Docket 89-7971.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 20, 1990.
Decided March 26, 1990.
 
 Jane M. Azia, New York City, Asst. Atty. Gen. of the State of N.Y. (Robert Abrams, Atty. Gen., of the State of N.Y., John W. Corwin, Asst. Atty. Gen. in Charge, Bureau of Consumer Frauds and Protection, Mary Hilgeman, Harvey M. Berman, Asst. Attys. Gen., of counsel), for defendant-appellant.
 William R. Stein, New York City (Hughes Hubbard & Reed, New York City and Washington, D.C., William R. Maguire, David B. Madoff, of counsel), for plaintiffs-appellees.
 John C. Lamb, Jeff B. Marschner, Richard A. Elbrecht, Mary-Alice Coleman, Legal Services Unit, Div. of Legal Affairs, California Dept. of Consumer Affairs, Sacramento, Cal., of counsel, for Michael A. Kelley, Director of Dept. of Consumer Affairs for the State of Cal., as amicus curiae.
 John S. Smith, III, Governor's Office of Consumer Affairs, Atlanta, Ga., for the Nat. Ass'n of Consumer Agency Administrators, Washington, D.C., as amicus curiae.
 Hubert H. Humphrey, III, Atty. Gen. of the State of Minn., D. Douglas Blanke, Asst. Atty. Gen., Tracy Smith, Sp. Asst. Atty. Gen., of counsel, for States of Minn., Conn., Fla., Ind. and Ohio, as amicus curiae.
 Before FEINBERG, CARDAMONE and MINER, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 In this appeal, we again face the increasingly complex problem of applying preemption doctrine. Defendant Robert Abrams, Attorney General of the State of New York, appeals from a judgment of the United States District Court for the Southern District of New York, Leonard B. Sand, J., holding certain amendments to New York's automobile "Lemon Law," in particular, GBL Secs. 198-a(g), (h) and (m), preempted under the Supremacy Clause of the United States Constitution by the Magnuson-Moss Warranty Act, 15 U.S.C. Secs. 2301-2312, and by regulations promulgated by the Federal Trade Commission (the FTC) pursuant to the Act (the FTC Regulations). See 16 C.F.R. Secs. 703.1-703.8. The judge's opinion is reported at 697 F.Supp. 726. We conclude that the Lemon Law amendments are not preempted, and thus reverse and remand.
 
 Background
 
 2
 Next to a house, a car is perhaps the most significant purchase that most consumers make. Manufacturers of automobiles routinely provide warranties to consumers. Until relatively recently, however, these warranties were governed exclusively by the Uniform Commercial Code (UCC) and state common law, and a consumer who had a dispute with a manufacturer concerning performance of a car under the warranty had only the remedies of suit under the UCC or the common law. These remedies apparently were not effective, particularly for a consumer saddled with a chronically defective automobile, popularly known as a "lemon."
 
 
 3
 After many years of study, and partially in response to "a rising tide of complaints ... from irate owners of motor vehicles complaining that automobile manufacturers and dealers were not performing in accordance with the warranties on their automobiles," H.R.Rep. No. 93-1107, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin.News 7702, 7708, Congress passed the Magnuson-Moss Warranty Act (the Act) in 1975. See Pub.L. 93-637, 88 Stat. 2183. The thrust of the Act is disclosure. "In order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products," the Act requires that "any warrantor warranting a consumer product" must "fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty." 15 U.S.C. Sec. 2302(a). The Act does not require that a warranty be provided, but mandates that, if one is given, it not be misleading.
 
 
 4
 As an additional goal, the Act is designed to encourage warrantors of consumer products "to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms." 15 U.S.C. Sec. 2310(a)(1). To accomplish this, the Act directs the FTC to "prescribe rules setting forth minimum requirements for any informal dispute settlement procedure," id. Sec. 2310(a)(2), and states that a warrantor "may establish an informal dispute settlement procedure which meets the requirements" laid down by the FTC. Id. Sec. 2310(a)(3). If a warrantor's mechanism meets the minimum requirements established by the FTC, the Act permits the warrantor to require consumers to resort to its dispute settlement mechanism before suing it under the Act. Id.
 
 
 5
 The FTC subsequently promulgated regulations governing such mechanisms. See Part 703--Informal Dispute Settlement Mechanisms: Promulgation of Rule, 40 Fed.Reg. 60190, 60191 (Dec. 31, 1975). The FTC Regulations set forth requirements such as organization of the dispute settlement mechanism, qualification of arbitrators, operation of the mechanism, recordkeeping, audits and openness of records and proceedings. See 16 C.F.R. Sec. 703.3-703.8.
 
 
 6
 The Act, however, apparently was not successful in resolving consumer problems with chronically defective automobiles. Appellant Abrams, for example, reported that his office and other consumer protection agencies had received an "endless stream of consumer complaints regarding the purchase of new cars which fail to meet reasonable standards of quality, durability and performance." In response, and along with a number of other states, New York in 1983 passed the Lemon Law. See 1983 N.Y.Laws 1883, ch. 444 (codified at GBL Sec. 198-a); see generally Note, Lemon Laws: Putting the Squeeze on Automobile Manufacturers, 61 Wash.U.L.Q. 1125, 1147 n. 119 (1984) (citing statutes). The heart of the Lemon Law is its "refund or replace" provision--i.e., its requirement that, during the first two years or 18,000 miles of operation, GBL Sec. 198-a(b), if a manufacturer is unable to repair the same problem after four tries or if a vehicle is out of service for a total of 30 days or more, id. Sec. 198-a(d), then "the manufacturer, at the option of the consumer, shall replace the motor vehicle with a comparable motor vehicle, or accept return of the vehicle from the consumer and refund to the consumer the full purchase price" of the automobile. Id. Sec. 198a(c)(1).
 
 
 7
 In 1986, New York amended the Lemon Law, adding the provisions under attack in this case. See 1986 N.Y.Laws 3077, ch. 799 (amending various subsections of GBL Sec. 198-a). Among other things, the Lemon Law amendments were designed to address "growing consumer dissatisfaction with informal dispute settlement mechanisms" administered by motor vehicle manufacturers. Approval Memorandum of Governor Cuomo, Senate Bill No. 3342-A, August 2, 1986. The Lemon Law amendments provide that although a manufacturer is not required to offer a dispute resolution mechanism in New York, if a manufacturer does so, it must, at a minimum: comply with the Lemon Law, GBL Sec. 198a(g); comply with the FTC Regulations, id. Sec. 198a(m)(1)(ii); provide arbitrators trained in arbitration and familiar with the Lemon Law, id. Sec. 198-a(m)(1)(i); and afford consumers an opportunity to make an oral presentation to the arbitrator. Id. In addition, both arbitrators and consumers must receive a copy of a document entitled "New Car Lemon Law Bill of Rights," outlining consumers' substantive rights under the statute. Id.; see also id. Sec. 198-a(m)(2) (text of New Car Lemon Law Bill of Rights). The Lemon Law amendments also require a manufacturer to comply with any decision accepted by the consumer within 30 days of acceptance, or face penalties for non-compliance, id. Sec. 198-a(h), and to keep certain records of the awards by the mechanism and the number of days it takes to issue and comply with decisions. Id. Sec. 198-a(m)(3).
 
 
 8
 In December 1986, plaintiffs-appellees brought the suit now before us. Plaintiff-appellee Motor Vehicle Manufacturers Association of the United States, Inc., is a trade association of various domestic motor vehicle manufacturers, while plaintiff-appellee Automobile Importers of America, Inc., is a trade association of various foreign motor vehicle manufacturers, importers and distributors. In their original and amended complaints, appellees challenged the Lemon Law amendments on the ground that they conflicted with various provisions of the United States Constitution, including the Supremacy Clause. Only the latter claim is now before us.
 
 
 9
 In 1988, the district court ruled that the Act and the FTC Regulations occupied the field of informal dispute resolution mechanisms, and that "there is no room in this system for states to tinker with the federal criteria, possibly discouraging the creation of mechanisms." 697 F.Supp. at 736. In addition, although the district court stated that the Lemon Law amendments "do not appear draconian," id. at 729, it nevertheless found that there were "a number of ways in which the state statute actually conflicts with the federal statute and regulations." Id. at 742. The district court thus held that the Lemon Law amendments were preempted by the Act and by the FTC Regulations. Id. at 744. After all the other claims raised by plaintiffs were disposed of, this appeal followed.
 
 Discussion
 
 10
 Appellant Abrams contends that the district court erred in holding that the Act and the FTC Regulations preempt the Lemon Law amendments. Appellant argues that Congress has not occupied the field of consumer protection in general or consumer arbitration programs in particular, and that there is no actual conflict between the Lemon Law amendments and the federal regulatory scheme. Appellees, on the other hand, assert that the Lemon Law amendments are preempted because Congress intended to occupy the area exclusively and because the amendments conflict with federal law.
 
 
 11
 We begin our analysis with the standards governing preemption. There are several ways in which preemption may occur. See Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 712-13, 105 S.Ct. 2371, 2374-75, 85 L.Ed.2d 714 (1985); National Fuel Gas Supply Corp. v. Public Serv. Comm'n, 894 F.2d 571, 575 (2d Cir.1990). Congress can preempt state law expressly, "by so stating in explicit terms on the face of a statute." Environmental Encapsulating Corp. v. City of New York, 855 F.2d 48, 53 (2d Cir.1988). Furthermore, in the absence of an express statement, Congress may still preempt state law when it "intends that federal law occupy a given field." California v. ARC America Corp., --- U.S. ----, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). And even if Congress does not expressly preempt or intend to occupy the field, state law is nevertheless preempted if it "actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]' " Id. (citations omitted; quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).
 
 
 12
 The Supreme Court has cautioned, however, that courts must, when considering a preemption claim, give careful attention to the subject matter of the congressional legislation. "When Congress legislates in a field traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Thus, a litigant challenging a state statute on preemption grounds in such a field must overcome a "presumption against finding pre-emption of state law." Id.
 
 
 13
 Appellees concede that the present case does not involve a claim of express preemption. Rather, the questions before us are whether Congress intended to occupy the field of regulation of manufacturers' informal dispute resolution mechanisms, and whether the Lemon Law amendments actually conflict with the Act and the FTC Regulations. In resolving these issues, we bear in mind that consumer protection through warranty law is an area of traditional state regulation. Chrysler Corp. v. Texas Motor Vehicle Comm'n, 755 F.2d 1192, 1205 (5th Cir.1985); see ARC America, 109 S.Ct. at 1665 (noting the "long history" of state regulation of monopolies and unfair business practices). Indeed, "it was not until 1975 that Congress entered the fray" by passing the Act. Chrysler Corp., 755 F.2d at 1205. As a result, "appellees must overcome the presumption against finding pre-emption of state law" in this area. ARC America, 109 S.Ct. at 1665.
 
 
 14
 A. Did Congress Intend to Occupy the Field?
 
 
 15
 Appellees insist that Congress intended to occupy the field of informal settlement mechanisms for warranty disputes. They argue that the FTC has promulgated extensive regulations governing every aspect of informal settlement mechanisms, and assert that the Lemon Law amendments upset the balance of interests carefully struck by the Act and the FTC Regulations.
 
 
 16
 We are not persuaded that Congress intended to occupy the field. Certainly, appellees have not met their burden of showing that the "clear and manifest purpose of Congress," Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), in legislating in this area of traditional state regulation was to preempt state law. Indeed, the purpose of Congress seems to have been just the opposite--that is, that federal law and state law should exist side by side. Thus, the Act directs the FTC to "prescribe rules setting forth minimum requirements for any informal dispute settlement procedure." 15 U.S.C. Sec. 2310(a)(2) (emphasis added). Use of the term "minimum" strongly suggests that Congress intended federal law in this area to supplement, not supplant, the rights and remedies provided by state law. Otherwise, the term "minimum requirements," rather than "maximum requirements," "exclusive requirements" or some similar phrase would make no sense in this context.
 
 
 17
 This reading of the Act is bolstered by other terms of the statute. The Act contains a broad savings clause, which states that "[n]othing in this chapter shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law." Id. Sec. 2311(b)(1). Furthermore, the Act does have an express premption provision, but its effect is narrowly limited to preempting state requirements relating "to labeling or disclosure with respect to written warranties or performance thereunder." Id. Sec. 2311(c)(1)(A). Obviously, Congress knew how to preempt in this very statute when it wanted to. And, the Act allows a warrantor to establish a mechanism that does not conform to the FTC Regulations, so long as the warrantor does not require resort to the mechanism as a prerequisite to filing a lawsuit under the Act. See id. Sec. 2310(a)(3). If the Act contemplates non-conforming mechanisms, it is hard to see how Congress can be said to have occupied the field.
 
 
 18
 In addition, the legislative history of the Act underlines that it was intended as an alternative, not as an exclusive, approach to informal resolution of warranty disputes. The Senate Conference Report accompanying the Act noted that if a consumer chooses not to use the dispute settlement procedures established under 15 U.S.C. Sec. 2310, then the Act's savings clause "preserves all alternative avenues of redress, and utilization of any informal dispute settlement mechanism would then not be required by any provision of this Act." S.Conf.Rep. No. 93-1408, 93rd Cong., 2d Sess. (1974) (emphasis added), reprinted in 1974 U.S.Code Cong. & Admin.News 7755, 7759.
 
 
 19
 Finally, the FTC itself has interpreted the Act as a supplement to, not a replacement for, state law. Thus, the FTC has stated that the provision that state laws relating to labeling or disclosure are preempted except as provided in the Act's savings clause "makes it absolutely clear that consumer rights and remedies under state law would never be affected by the" Act. Warranties Complying with Magnuson-Moss Warranty Act, 42 Fed.Reg. 54004, 54005 (Oct. 4, 1977) (emphasis added). The FTC has also asserted that "[i]n general, the protections of the Warranty Act are in addition to, rather than in lieu of, warranty rights and remedies under State law," and that although "allowing the use of uniform warranty documents is a goal of section 111 [15 U.S.C. Sec. 2311], this goal is subordinate to that of permitting the States to fashion their own scheme of warranty rights and remedies which may be more protective than the minimum level of protection of the Federal Act." Preemptive Effect of Section 111(c)(1) of the Magnuson-Moss Warranty Act, 43 Fed.Reg. 50737, 50737-38 (Oct. 31, 1978) (footnote omitted; emphasis added); see also Part 703-Informal Dispute Settlement Mechanisms: Promulgation of Rule, 40 Fed.Reg. 60190, 60191 (Dec. 31, 1975) ("[B]y incorporating a mechanism into a written warranty, the warrantor undertakes obligations in addition to, not in lieu of, obligations under existing law."). In addition, the regulations that the FTC promulgated pursuant to the Act require manufacturers to alert consumers that state law may provide additional rights and protections. See, e.g., 16 C.F.R. Secs. 701.3(a)(7)-(9).
 
 
 20
 Appellees play down the Act's use of the term "minimum requirements" by arguing that all Congress intended was to leave room for manufacturers to adopt additional requirements voluntarily, not for the states to add requirements. We believe that the Act's other provisions, its legislative history and the FTC's interpretations cited above do not support the view that the term "minimum requirements" gives leeway to manufacturers but not to anyone else.
 
 
 21
 Appellees also contend that under cases such as International Paper Co. v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), Congress can still preempt despite the Act's reference to minimum requirements and despite its savings clause, because the Act and the FTC Regulations set up a carefully articulated regulatory scheme that state law upsets. Appellees fail to recognize, however, that the cases they cite in support of preemption involved instances where there was a clear statement of Congress' intent to preempt state law, see, e.g., Fidelity Federal Sav. & Loan Ass'n, 458 U.S. at 147, 102 S.Ct. at 3019, or involved the regulation of matters of peculiarly federal concern. See, e.g., International Paper Co., 479 U.S. at 487, 107 S.Ct. at 809 (interstate water pollution); Atlantic Richfield Co., 435 U.S. at 154-55, 98 S.Ct. at 992-93 (tanker design and tanker navigation in waters "controlled in major respects by federal law"). Appellees also argue that the comprehensiveness of the FTC Regulations manifests a Congressional intention to preempt the field. However, in a field traditionally regulated by state law, "[w]e are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes." Hillsborough County, 471 U.S. at 717, 105 S.Ct. at 2377.
 
 
 22
 Finally, appellees point out that the Fourth Circuit has held that Congress intended to occupy the field, citing Wolf v. Ford Motor Co., 829 F.2d 1277, 1279-80 (4th Cir.1987). However, there is conflicting authority, particularly Automobile Importers of America, Inc. v. Minnesota, 871 F.2d 717, 721-22 (8th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989); see also Chrysler Corp., 755 F.2d at 1203-04.[1] With all deference, we find the result reached by the Eighth Circuit in Automobile Importers more persuasive than that of the Fourth Circuit in Wolf. The panel in the latter case did not consider the meaning of the Act's reference to "minimum requirements," which we find significant. See 829 F.2d at 1279-80. Nor did Wolf refer to the Act's savings clause, its legislative history or the FTC's interpretations of the Act, upon all of which we have relied.
 
 
 23
 The Act obviously represents a compromise between warrantors and consumers and, as is frequently the case in such situations, the process of compromise results in a statute creating problems of interpretation. We do not suggest that the Act is crystal clear on the issue of preemption. If it were, presumably this litigation would not be before us. But precisely because the Act is not absolutely clear, the presumption against preempting state regulation in a field traditionally ruled by state law takes on importance. Appellees may be correct that state laws such as the Lemon Law create difficulty for them, and that the lack of uniformity in this area is undesirable. We express no view as to that. However, we believe that this argument is addressed to the wrong forum. It is for Congress and the agency to which it has delegated its power, the FTC, to make the policy judgment whether national uniformity in the regulation of manufacturers' dispute settlement mechanisms is desirable. By contrast, our task is to determine if Congress has already demonstrated its intention to preempt state law. We hold that Congress did not intend to occupy the field of informal settlement mechanisms for warranty disputes.
 
 
 24
 B. Do the Lemon Law Amendments Actually Conflict with the Act and the FTC Regulations?
 
 
 25
 Appellees assert that the Lemon Law amendments actually conflict with the Act and the FTC Regulations. As noted above, a state statute "actually conflicts with federal law" when "compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]' " ARC America Corp., 109 S.Ct. at 1665 (citations omitted; quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Appellees claim that both types of actual conflict are present here.
 
 
 26
 1. Is Compliance Impossible?
 
 
 27
 We turn first to the argument that compliance with both the state and federal law is impossible. There are a number of differences between the Lemon Law amendments and the FTC Regulations. First, private dispute decisions are binding upon the manufacturer if the consumer so elects under the Lemon Law amendments, while decisions are not legally binding on anyone under the FTC Regulations. Second, consumers have the right to make an oral presentation to the arbitrator under the Lemon Law amendments, but oral presentations are only permitted under the FTC Regulations if both parties agree, and if certain disclosures are made to the consumer. Third, mechanisms must comply with the Lemon Law, and presumably its substantive terms, while arbitrators may apply any remedies that are appropriate in the circumstances under the FTC Regulations. Fourth, the Lemon Law amendments require that mechanisms compile more extensive records than do the FTC Regulations. Fifth, the Lemon Law amendments demand that mechanism staff be familiar with the Lemon Law's provisions and trained in arbitration, while the FTC Regulations require only that the mechanism be staffed by persons interested in the fair and expeditious settlement of consumer disputes.
 
 
 28
 While the differences between the Lemon Law amendments and FTC Regulations are obviously not earth-shattering, appellees are nevertheless correct that they exist. However, for preemption to occur here, there must be more than mere differences between the state and federal regulatory systems; rather, compliance with the two must be a "physical impossibility." Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963); see also ARC America Corp., 109 S.Ct. at 1665 (actual conflict means that "compliance with both state and federal law is impossible"). We are not persuaded that it is physically impossible to comply with both the Lemon Law amendments and the FTC Regulations.
 
 
 29
 For example, even though the consumer's acceptance of the arbitrator's decision under the Lemon Law amendments makes the mechanism's decision binding, nothing in the Act or the FTC Regulations forbids a warrantor from entering into binding arbitration. Furthermore, while the FTC Regulations state that decisions of the mechanisms shall not be legally binding on any person, a manufacturer remains free not to set up a mechanism in New York thus avoiding a binding dispute resolution under the challenged provisions of the Lemon Law. Similarly, as to the Lemon Law amendments' requirement that mechanisms comply with the Lemon Law, nothing in the FTC Regulations says that the Lemon Law's substantive remedies--and, in particular, its core "replace or return" provision--are forbidden under federal law. Indeed, the FTC Regulations specifically list "repair, replacement, refund, reimbursement for expenses" as possible remedies. 16 C.F.R. Sec. 703.5(d)(1). And, the FTC Regulations' rather vague reference to "any remedies appropriate under the circumstances," id., practically invites alternative remedies.
 
 
 30
 Nor do we find that the Lemon Law amendments' oral hearing provision makes compliance with the Act and the FTC Regulations impossible. The latter explicitly permit oral hearings, and only differ from the Lemon Law amendments in providing that both the warrantor and the consumer must agree to have an oral hearing, and that certain disclosures must be made to the consumer. Furthermore, the record reveals that several manufacturers who apparently comply with the FTC Regulations offer oral hearings as part of their programs.
 
 
 31
 Moreover, that the Lemon Law amendments impose training and recordkeeping requirements different from those required by the FTC Regulations does not by itself establish a conflict warranting preemption. See Environmental Encapsulating Corp., 855 F.2d at 59. In Hillsborough County, for example, the Supreme Court upheld, against preemption challenge, a state statute imposing "testing and recordkeeping requirements" concerning the donation of blood "beyond those contained in the federal regulations" promulgated by the Food and Drug Administration. 471 U.S. at 710, 105 S.Ct. at 2373. Given the size and sophistication of automobile manufacturers, and the ready availability of computer technology, appellees' protests that they cannot comply simultaneously with the recordkeeping requirements of the Lemon Law amendments and the FTC Regulations are not convincing.
 
 
 32
 We also note that a panel of this court recently rejected a preemption challenge--albeit in a somewhat different factual context--to certain of the Lemon Law amendments. In General Motors Corp. v. Abrams, 897 F.2d 34 at 36 (2d Cir.1990), the manufacturer (GM) and the FTC had entered into a consent decree, which required GM to operate an arbitration mechanism under the auspices of the Better Business Bureau. See id., at 37. The issue before the panel was whether certain provisions of the Lemon Law amendments were preempted by the decree. Id., at 36, 37-38. Among other things, the panel held, over Judge Winter's dissent, that the Lemon Law amendments' requirements that GM's arbitration program comply with the Lemon Law, that arbitrators be trained in the Lemon Law and that additional records be kept did not actually conflict with the consent order. Id., at 43. These are among the statutory provisions that appellees in the present case claim present a direct conflict with federal law. Thus, although General Motors may technically not be dispositive in the broader factual context now before us, it considerably strengthens our conclusion that compliance with the Lemon Law amendments and the Act and FTC Regulations is not "physically impossible." Id., at 40.
 
 
 33
 Appellees also contend that the Lemon Law amendments interfere with certain federally protected rights under the Act, such as a warrantor's right to incorporate a mechanism that conforms to the Act's minimum standards into its written warranties, and the right to operate a nonconforming mechanism. In addition, they assert that the Lemon Law amendments encroach on the "exclusive" federal supervision of warrantors' informal dispute resolution mechanisms, and that the Lemon Law amendments' requirement that a mechanism comply with the FTC Regulations is impossible to obey, since a mechanism cannot simultaneously comply with the FTC Regulations and the Lemon Law amendments.
 
 
 34
 None of these contentions persuade us that the Lemon Law amendments are preempted. The heart of appellees' argument is that manufacturers have an affirmative "right," granted to them by the Act and the FTC Regulations, to operate a mechanism in New York that does not comply with the Lemon Law Amendments. We find no such right in the Act or the FTC Regulations. With regard to the allegedly exclusive federal supervision of mechanisms, we simply do not agree, in light of the Act's use of the term "minimum requirements," that the federal regulatory scheme is meant to be exclusive. Finally, since we do not believe that compliance with both the Lemon Law amendments and the FTC Regulations is impossible, the Lemon Law amendments' requirement that mechanisms comply with the FTC Regulations is inoffensive.
 
 
 35
 2. Do the Lemon Law Amendments Frustrate the Purpose of Congress?
 
 
 36
 Appellees also contend that the Lemon Law amendments frustrate the purpose of Congress. According to appellees, the Act and the FTC Regulations are meant only to encourage manufacturers to establish voluntary mechanisms, and the Lemon Law amendments discourage the formation of mechanisms by disturbing the federal regulatory scheme. We do not agree that the purpose of Congress was so narrow. Although appellees are correct that the Act had as a goal "to encourage warrantors to establish ... informal dispute settlement mechanisms," 15 U.S.C. Sec. 2310(a)(1), Congress did not desire the formation of such mechanisms as an end in itself. Rather, consistent with the broad consumer protection goal of the Act, Congress wanted "to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms." Id. (emphasis added). It would be myopic to interpret the purpose of Congress as only encouraging warrantors and not also protecting consumers. See Id. Sec. 2302(a) (Act has among its purposes "to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products"); H.R.Rep. No. 93-1107, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin.News 7702, 7748 (provisions contained in the Act will, among other things, "promote greater consumer understanding of product warranties, assist the consumer in the enforcement of his warranty," and "assist in alleviating the inequities resulting from" the consumer's relative lack of bargaining power vis-a-vis the warrantor).
 
 
 37
 The Lemon Law amendments further, and do not frustrate, this additional purpose. They were designed in significant part to protect consumers--i.e., to address "growing consumer dissatisfaction with informal dispute settlement mechanisms" administered by motor vehicle manufacturers. Approval Memorandum of Governor Cuomo, Senate Bill No. 3342-A, August 2, 1986. And, the thrust of the Lemon Law amendments is to give consumers more power in the dispute resolution process. Thus, consumers have an opportunity to make an oral presentation to the arbitrator; prior to arbitration, both arbitrators and consumers must receive a "New Car Lemon Law Bill of Rights," outlining consumers' substantive rights under the statute; and, a manufacturer must comply with any decision accepted by the consumer within 30 days of acceptance, or face penalties for non-compliance. It is hard to see how these provisions could be interpreted as frustrating the Act's goal of "fair[ ] and expeditious[ ] settle[ment]" of consumer disputes. 15 U.S.C. Sec. 2310(a).
 
 Conclusion
 
 38
 In conclusion, we hold that the Act and the FTC Regulations do not preempt the Lemon Law amendments. In reaching this result, we rule that Congress did not intend to occupy the field of informal dispute resolution mechanisms, that it is possible to comply with both the New York and federal schemes and that the Lemon Law amendments do not frustrate the purpose of Congress. We thus reverse the judgment of the district court, and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 Relying on a single sentence in the lengthy opinion in Chrysler Corp., appellees read that decision as supporting their view. However, the Chrysler Corp. panel said "we are unpersuaded by Chrysler's arguments that federal law occupies the field of informal settlement mechanisms for warranty disputes or that federal law either expressly or impliedly preempts the remedies and procedures created by" state law. 755 F.2d at 1203-04