**HOUSING AND REDEVELOPMENT AUTHORITY OF DULUTH, Respondent,**

v.

**Brian LEE, Appellant.**

**No. A12–2078.**

Court of Appeals of Minnesota.

July 1, 2013.

Joseph J. Mihalek, Eric S. Johnson, Fryberger, Buchanan, Smith, & Frederick, P.A., Duluth, MN, for respondent.

Gwen Updegraff, Legal Aid Service of Northeastern Minnesota, Duluth, MN, for appellant.

Considered and decided by HUDSON, Presiding Judge; SCHELLHAS, Judge; and STAUBER, Judge.

## OPINION

HUDSON, Judge.

On appeal in this eviction matter, appellant-tenant argues that his eviction was invalid because it resulted from the imposition of late fees exceeding eight percent of appellant's rent payment in violation of Minn.Stat. § 504B.177(a). Appellant also argues that the district court erred by determining that section 504B.177(a) conflicts with federal regulations and guidelines permitting landlords to impose "reasonable" late fees on public-housing tenants, and that state law was therefore preempted. Because Minn. Stat. § 504B.177(a) does not conflict with any federal statute, regulation, or guideline, respondent-landlord was required to comply with the statute's provision prohibiting the imposition of late fees exceeding eight percent of a tenant's overdue rent payment. And because there would have been no legal basis for eviction had respondent complied with Minn. Stat. § 504B.177(a), we reverse.

## FACTS

Appellant Brian Lee was a tenant living in a multi-unit apartment building owned by respondent, the Housing and Redevelopment Authority of Duluth, a public housing authority (PHA). *See* 42 U.S.C. § 1437a(b)(6)(B) (2006). The premises are conventional subsidized public housing under the Section 8 housing-assistance program. *See* 42 U.S.C. § 1437f (2006 & Supp.2011).

Appellant's sole source of income is general assistance benefits of $203 per month. Based on his income, and under the terms of the lease, appellant's rent was $50 per month. The lease provided that appellant was to be assessed a $25 late charge each month that he did not pay his rent in full by the fifth of the month. Appellant's account became delinquent in July 2012 after he failed to pay in full a $95.50 charge assessed for repair and maintenance services. As a result, his rent payment was late in July, August, and September 2012, and he was assessed three late charges totaling $75. On September 26, 2012, respondent filed an eviction action for nonpayment of rent. Appellant was $50 in arrears when the eviction action was commenced.

The parties stipulated that respondent was entitled to evict appellant unless the district court determined that the late fee was barred by Minn.Stat. § 504B.177(a). The issue was submitted to the district court on cross motions for summary judgment.

The district court held that the $25 late fee was "reasonable and valid," entering judgment for respondent on November 8, 2012. The district court concluded that there was a conflict between the federal and state regulations, because federal regulations place no cap on the late fees that may be assessed by a PHA, other than that the amount must be reasonable, even though Minn.Stat. § 504B.177(a) caps the late fee at eight percent of the monthly rent, which might be lower than what a PHA deems to be a reasonable late fee. The district court concluded that, because the federal and state regulations conflict, the federal scheme preempts the state statute. This appeal follows.

## ISSUES

I. Is Minn.Stat. § 504B.177(a) preempted by federal law?

II. Does the provision prohibiting late fees exceeding eight percent of the overdue rent payment in Minn.Stat.

§ 504B.177(a) conflict with a federal statute, regulation, or handbook, thereby permitting landlords of federally-subsidized housing to impose a late fee that complies with the federal, but not the state, standard under Minn.Stat. § 504B.177(b) (2012)?

## ANALYSIS

### I

The district court held that federal law permitting PHAs to charge late fees so long as they are reasonable preempts the provision in Minn.Stat. § 504B.177(a) prohibiting the imposition of late fees exceeding eight percent of the overdue rent payment. "Whether federal law preempts state law is primarily an issue of statutory interpretation, which we review de novo." *In re Estate of Barg,* 752 N.W.2d 52, 63 (Minn.2008).

### State law

Under Minnesota law, "[a] landlord of a residential building may not charge a late fee ... unless the tenant and landlord have agreed in writing that a late fee may be imposed." Minn.Stat. § 504B.177(a). "In no case may the late fee exceed eight percent of the overdue rent payment." *Id.* The district court held that this provision, as it applies to federally-subsidized housing, is preempted by federal law.

### Federal law

PHAs are required to enter into a written lease with each tenant. 24 C.F.R. § 966.4 (2012). "At the option of the PHA, the lease *may provide* for payment of penalties for late payment." 24 C.F.R. § 966.4(b)(3) (emphasis added). While the regulations do not establish a maximum late fee, PHAs are required to "utilize leases which ... do not contain unreasonable terms and conditions." 42 U.S.C. § 1437d(*l*)(2) (2006).

The U.S. Department of Housing and Urban Development (HUD) publishes a guidebook "designed to assist [PHAs] and HUD with a range of issues related to public housing occupancy." U.S. Dep't of Hous. & Urban Dev., *Public Housing Occupancy Guidebook* 1 (2003). Regarding late fees, the HUD guidebook states that while "many PHAs have adopted late payment penalties ... these terms are considered optional under the lease requirements of 24 C.F.R. § 966.4." *Id.* at 189. The guidebook instructs PHAs that "[l]ease provisions, taken as a whole, should be 'reasonable' according to their plain meaning." *Id.* Lease terms such as late fee provisions are "always subject to the reasonableness test. The lease terms are subject to court review when an action proceeds to court, such as in a lease termination." *Id.* at 190. "If a [lease] term is found to be unfair then that term will not be binding on the party to whom it applies." *Id.*

### Preemption doctrine

Under the Supremacy Clause of the United States Constitution, the federal government may preempt state law. U.S. Const., art. VI, cl. 2 ("This Constitution and the Laws of the United States ... shall be the supreme Law of the Land...."). "The purpose of Congress is the ultimate touchstone" in each preemption case. *Retail Clerks Int'l Ass'n v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963).

Congress may preempt state law in three ways. *Cal. Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). First, Congress may expressly preempt state law. *English v. Gen. Elec. Co.,* 496 U.S. 72, 78, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). Second, it may do so by fully occupying a field, such that congressional intent to preempt "may be in-

ferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." *Guerra,* 479 U.S. at 280–81, 107 S.Ct. at 689 (quotation omitted). Neither express nor field preemption is at issue here.

■ Third, state law is preempted "to the extent that it actually conflicts with federal law." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Conflict preemption arises when (1) "compliance with both federal and state regulations is a physical impossibility," or (2) "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963) (quotation marks omitted); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)) (quotation marks omitted). The parties agree that conflict preemption is at issue here.

■ Along with Congress, "a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law." *City of N.Y. v. FCC,* 486 U.S. 57, 63–64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988) (quotation omitted). A reviewing court does not focus on congressional intent when analyzing the preemptive effect of federal regulation because a "preemptive regulation's force does not depend on express congressional authorization to displace state law." *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023. Instead, the court is to consider whether the federal agency intended to preempt the state law in question, and if so, whether that action is with-

in the scope of the agency's delegated authority. *Id.* A federal agency's preemption of state law is invalid if it appears from the authorizing statute or its legislative history that Congress would not have sanctioned the preemption. *City of N.Y.,* 486 U.S. at 64, 108 S.Ct. at 1642. Given the many modes of communication available to agencies including regulations, interpretive statements, responses to comments, and, as here, guidebooks, "we can expect that they will make their intentions clear if they intend for their regulations to be exclusive." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 718, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985).

■ When "Congress has legislated in a field which the states have traditionally occupied, we start with the assumption that the historic police powers of the states were not to be superseded by the federal act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 1194–95, 173 L.Ed.2d 51 (2009) (quotation omitted). That assumption guides our analysis here, because regulation of landlord-tenant relations is a traditional area of state concern. *Lindsey v. Normet,* 405 U.S. 56, 68–69, 92 S.Ct. 862, 871–72, 31 L.Ed.2d 36 (1972). More broadly, contract and real property law are traditional state domains. *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 262, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979) (contract law); *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 378–79, 97 S.Ct. 582, 591, 50 L.Ed.2d 550 (1977) (real property law).

■ While HUD has the authority to regulate PHAs that receive federal funding, public-housing regulation is not an exclusive area of federal concern because the network of federal subsidized-housing laws "is superimposed upon and conscious-

ly interdependent of local law relating to housing." *Kargman v. Sullivan*, 552 F.2d 2, 11 (1st Cir.1977); *see, e.g.,* 42 U.S.C. § 1437d(f) (2006) (providing that public housing must meet or exceed federal, state, and local housing quality standards); 12 U.S.C. § 1715*l* (d)(2) (2006) (requiring a financed property to meet the requirements of "all State laws, or local ordinances or regulations" to qualify for a federally-subsidized low- or moderate-income housing loan).

To conclude that Minn.Stat. § 504B.177(a) is preempted, therefore, we must find "a conflict ... that is strong enough to overcome the presumption that state and local regulation of [traditional areas of state concern] can constitutionally coexist with federal regulation." *Hillsborough Cnty.*, 471 U.S. at 716, 105 S.Ct. at 2376.

**Conflict preemption analysis**

■■■ With these principles in mind, we consider whether the district court erred in concluding that the HUD regulations and Minn.Stat. § 504B.177(a) actually conflict. Actual conflict exists if either (1) compliance with both federal and state law is impossible, or (2) state law is an obstacle to achieving the purposes of Congress. *de la Cuesta*, 458 U.S. at 153, 102 S.Ct. at 3022.

*Impossibility of compliance*

Here, compliance with both the federal and state standards is not an impossibility. Respondent could comply with both the state and federal standards by imposing a late fee equal to eight percent of a tenant's monthly rent, up to $25. In fact complying with both standards would not be difficult—any lease that complies with the federal standard can be amended by adding a clause capping the late fee at eight percent of the late payment amount, or simply

charging a dollar amount less than eight percent of the monthly rent amount.

■■ Respondent argues that compliance with both standards is impossible whenever a PHA imposes a late fee that exceeds eight percent of the tenant's monthly rent but is nonetheless "reasonable." This argument incorrectly assumes that a mere difference between state and federal law constitutes a conflict. But this form of conflict preemption only occurs "where it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 2294, 147 L.Ed.2d 352 (2000). "[F]or preemption to occur ... there must be more than mere differences between the state and federal regulatory systems." *Motor Vehicle Mfrs. Ass'n of U.S. v. Abrams*, 899 F.2d 1315, 1322 (2d Cir.1990).

Because compliance with both state and federal regulations is possible, federal intent to preempt must be evident to conclude that Minn.Stat. § 504B.177(a) is preempted. *See Wyeth*, 555 U.S. at 565, 129 S.Ct. at 1194–95 (stating that courts should assume that federal regulation in areas of traditional state concern is not preemptive absent explicit expression of federal intent to preempt).

We find no basis for determining that the reasonableness standard is intended to preempt stricter state and local regulation of lease terms. To the contrary, HUD's guidebook repeatedly emphasizes that PHAs must comply with all state and local laws governing lease terms. *Public Housing Occupancy Guidebook, supra,* at 5 (stating that PHA leases must comply with both HUD requirements as well as "the requirements imposed by state and local laws"); *id.* at 185 (stating that "[i]n addition to HUD's requirements for lease language, PHAs are bound by state and local landlord-tenant laws"); *id.* (advising "each

PHA" to "review the lease form for compliance with state and local requirements"); *id.* at 187 (notifying landlords that, in addition to lease provisions prohibited by federal law, "[s]tate and local landlord-tenant statutes may establish additional prohibited provisions").

The guidebook also explicitly states that its regulations are not intended to preempt state and local regulations that are more favorable to the tenant: "In the case of any conflict between the proposed HUD lease and state law, the lease adopted must follow the rule that is the most beneficial to the tenant." *Id.* at 185.

Respondent further argues that we should ignore HUD's stated deference to state and local law because it is inconsistent with federal law and therefore "turns the doctrine of federal preemption on its head." Yet respondent points to no preemptive language within the authorizing Section 8 statute and thus has not shown that Congress demonstrated any intent to preempt state regulation. In fact, the legislative history of Section 8 reveals that Congress intended for assisted tenants to benefit from all protections available under state and local law in addition to those protections afforded by federal law. *Barrientos v. 1801–1825 Morton LLC,* 583 F.3d 1197, 1210 (9th Cir.2009). And because we are considering the preemptive effect of the federal regulation permitting PHAs to impose late fees, our concern is with the intent of HUD, rather than Congress. *See* 24 C.F.R. § 966.4(b)(3); *Hillsborough Cnty.,* 471 U.S. at 714, 105 S.Ct. at 2376.

■ We also note that, by establishing baseline requirements for lease terms without expressly preempting local and state lease regulations, HUD's regulations establish "a federal floor below which protections for tenants [may] not drop, not a ceiling above which they [may] not rise." *Barrientos,* 583 F.3d at 1211. Generally, absent express preemption language, a federal standard creates a floor allowing more stringent state regulation. *See, e.g., Atherton v. F.D.I.C.,* 519 U.S. 213, 227, 117 S.Ct. 666, 674, 136 L.Ed.2d 656 (1997) (holding that a federal statute's " 'gross negligence' standard provides only a floor" permitting a stricter state standard of liability). *English,* 496 U.S. at 90, 110 S.Ct. at 2281 (finding no preemption where state standard for whistleblower liability is more stringent than that provided by federal law); *Barrientos,* 583 F.3d at 1205, 1207 (concluding that HUD regulation allowing "no-cause terminations" at the end of a lease term did not preempt local regulations prohibiting evictions on the grounds of "[e]xpiration of the lease term or the desire to raise rent to current market levels with a new tenant"); *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 498 (9th Cir.1984) (finding that more stringent state environmental regulations were not preempted where the "state law prohibits acts that the federal regulations allow but do not require"). Thus, "it is well-settled that where a federal statute provides only a floor, such a statute 'does not stand in the way of a stricter standard that the laws of some states provide.' " *Frank Bros. v. Wis. Dep't of Transp.,* 409 F.3d 880, 895 (7th Cir.2005) (quoting *Atherton,* 519 U.S. at 227, 117 S.Ct. at 674). Consistent with this principle, we conclude that HUD's reasonableness standard for public-housing lease provisions creates a regulatory floor allowing for more stringent state regulations.[1]

---

1. Nothing in the sample lease in HUD's guidebook affects our analysis. While the sample lease in HUD's guidebook imposing a $1.00–per–day late fee might be "reasonable," although in violation of Minn.Stat. § 504B.177(a) as it relates to certain tenants,

*Frustration of congressional objectives*

We also conclude that Minn.Stat. § 504B.177(a) does not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022 (quotation omitted). The goal of HUD regulation, as expressed in the purpose governing public housing statutes, is to increase the availability and affordability of housing. *See* 42 U.S.C. § 1437f(a) (2006). The Minnesota statute furthers this goal by making it less likely that tenants will be evicted because they are unable to pay late fees. Furthermore, "[a]s evidenced by a variety of legislative enactments ... Congress and HUD intended to provide assisted tenants with more protections than unassisted tenants, not less. Congress only rejected the application of substantive state and local law to [S]ection 8 [leases] when asked to eliminate federal controls." *Barrientos,* 583 F.3d at 1210. In our view, it would interfere with congressional intent and purpose to protect all Minnesota renters against excessive late fees except for subsidized housing tenants, who are arguably the very tenants most in need of such protection.

We conclude that the state and federal laws do not actually conflict, and therefore, the district court erred by determining that Minn.Stat. § 504B.177(a) is preempted by federal law. In fact, they work in harmony: the federal standard prohibits the imposition of unreasonable late fees, and Minnesota has determined that a late fee exceeding eight percent of a tenant's monthly rent is unreasonable. "The teaching of this Court's decisions enjoins seeking out conflicts between state and federal regulation where none clearly exists." *English,* 496 U.S. at 90, 110 S.Ct. at 2281 (quotation omitted).

## II

■■ Respondent argues that, even if Minn.Stat. § 504B.177(a) is not preempted by federal law, under Minn.Stat. § 504B.177(b), it need not comply with the state standard so long as its late-fee provisions comply with the federal "reasonableness" standard. This issue presents a question of statutory construction, which we review de novo. *See Tischer v. Hous. & Redev. Auth. of Cambridge,* 693 N.W.2d 426, 428–29 (Minn.2005).

The goal of all statutory interpretation is to effectuate the intent of the legislature. Minn.Stat. § 645.16 (2012). We give words and phrases their plain and ordinary meaning in construing the language of a statute. Minn.Stat. § 645.08 (2012). But words and phrases that have acquired a special meaning in a particular legal context are to be construed according to their special meaning when used in that context. *In re Welfare of J.J.P.,* 831 N.W.2d 260, 265–67 (Minn.2013) (citing Minn.Stat. § 645.08(1)); *Staab v. Diocese of St. Cloud,* 813 N.W.2d 68, 74 (Minn. 2012).

"[I]f the language of the statute is clear and free from ambiguity, our role is to enforce the language of the statute." *Emerson v. Sch. Bd. of Indep. Sch. Dist. 199,* 809 N.W.2d 679, 682 (Minn.2012). An ambiguity exists only when a statute's language is subject to more than one reasonable interpretation. *Hans Hagen Homes, Inc. v. City of Minnetrista,* 728 N.W.2d

---

this does not evidence a conflict. *See Public Housing Occupancy Guidebook, supra,* at 288. The lease is merely a sample, and HUD explicitly states that the lease used by a PHA must comply with state and local require-

ments, demonstrating HUD's intent for its regulations to serve as a regulatory floor for tenants' rights. *See id.* at 286, 5; *Barrientos,* 583 F.3d at 1211.

536, 539 (Minn.2007). "If the meaning of statutory language is not plain, courts resolve ambiguity by looking to legislative intent, agency interpretation, and principles of continuity which include consistency with laws on the same or similar subjects." *Occhino v. Grover,* 640 N.W.2d 357, 360 (Minn.App.2002), *review denied* (Minn. May 28, 2002).

While paragraph (a) of Minn.Stat. § 504B.177 prohibits landlords from imposing late fees exceeding eight percent of the overdue amount, paragraph (b) states:

> Notwithstanding paragraph (a), if a federal statute, regulation, or handbook permitting late fees for a tenancy subsidized under a federal program conflicts with paragraph (a), then the landlord may publish and implement a late payment fee schedule that complies with the federal statute, regulation, or handbook.

Minn.Stat. § 504B.177(b).[2]

Respondent argues that, under the plain language of the statute, it is only required to comply with the federal standard for late fees because the eight-percent limit on late fees contained in Minn.Stat. § 504B.177(a) conflicts with the federal standard permitting reasonable late fees. Appellant argues that the state standard does not conflict with the federal standard because the eight-percent limit simply acts as a definition of what is reasonable in Minnesota. Because the district court found that the state statute was preempted, it did not address this issue.

This issue turns on the definition or standard we apply to determine whether a federal statute, regulation, or guidebook "conflicts" with the state statute. *See* Minn.Stat. § 504B.177(b). Applying the plain meaning of the word would produce an uncertain result. To conflict has been defined as "[t]o come into collision; to clash; to be at variance, be incompatible." *Oxford English Dictionary* 713 (2d ed.1989). Under this definition, the state statute does not conflict with federal law because it is compatible with the federal standard. Yet the verb "conflict" has also been defined as "[t]o be in or come into opposition; differ." *American Heritage Dictionary* 396 (3d ed.1996). Under this definition, because the state and federal standards differ, they conflict.

We need not decide which definition to adopt because, in the context of competing state and federal laws, "conflict" has acquired a special legal meaning that should be applied. *See J.J.P.,* 831 N.W.2d 260, at 265–67. The doctrine of conflict preemption has evolved over several decades in both Minnesota and federal courts. *See, e.g., Fla. Lime & Avocado Growers, Inc.,* 373 U.S. at 142–43, 83 S.Ct. at 1217; *Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 350–60, 143 N.W.2d 813, 815–21 (1966). When a statute enacted in 2010 asks us to consider whether state law "conflicts" with federal law, we must assume that the legislature is asking us to apply the preemption doctrine to determine if the state and federal laws conflict. *See Morissette v. U.S.,* 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952) (stating that when the legislature uses terms of art

**2.** Minn.Stat. § 504B.177 was enacted in 2010 and became effective January 1, 2011. 2010 Minn. Laws ch. 315, § 5, at 852. The statute was amended in 2012, and those amendments became effective August 1, 2012. 2012 Minn. Laws ch. 132, § 1, at 37. The statutory amendment replaced the phrase "providing for" with "permitting," and inserted the phrase "[n]otwithstanding paragraph (a)" at the beginning of paragraph (b). Although the older version of the statute was in effect when appellant entered into his lease and made his first late rent payment, the amendments are not ultimately relevant because our decision would be the same under either version of the statute. We therefore limit our analysis to the amended version of the statute.

that have "accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind"). That was the approach taken by this court in *State v. Kuhlman,* when we interpreted the meaning of the term "conflict" in Minn. Stat. § 169.022 (2004) by applying the preemption doctrine. *State v. Kuhlman,* 722 N.W.2d 1, 3–5 (Minn.App.2006), *aff'd,* 729 N.W.2d 577 (Minn.2007).[3] We adopt the same approach here.

The Minnesota Supreme Court has stated that a state statute "actually conflicts with federal law" when "compliance with both state and federal laws is impossible, or when the state law is 'an obstacle to the accomplishment and execution of the full purposes of Congress.'" *Barg,* 752 N.W.2d at 64 (quoting *Hines,* 312 U.S. at 67, 61 S.Ct. at 404) (other quotation and citation omitted).

Under this standard, Minn.Stat. § 504B.177(a) does not conflict with any federal statute, regulation, or guidebook governing the imposition of late fees upon federally-subsidized housing tenants. As discussed in section I above, compliance with both state and federal law is possible, and state law supports the purposes of federal law: to increase the availability and affordability of housing. *Id.*

Respondent further argues that the legislative history of the 2012 amendment demonstrates that the eight-percent limit on late fees was not intended to apply to PHAs. At a committee meeting, the sponsor of the amendment testified:

There were a number of changes last year to the state landlord-tenant laws. . . . We limited the late fees that landlords can charge and an issue arose in the area of subsidized housing where you might have a tenant, because their housing is subsidized, was only paying 20, 30 or 50 bucks a month for their housing and 8% of that as a late fee really doesn't become much of a deterrent to not paying even their limited rent. And there are federal regulations around these programs as well, so this [amendment] would allow for the late fee to reflect the standards in the federal programs that govern the subsidized housing.

Hearing on H.F. No. 1515 before the H. Comm. on Civil Law (April 27, 2011) (statement of Rep. Mary Liz Holberg).

Respondent argues that this hearing testimony demonstrates that the legislature intended for the federal standard to apply here. While Representative Holberg's comments may imply that the legislature intended to have the federal standard apply, the testimony demonstrates no intent to define what constitutes a conflict, nor is it explained how the federal standard conflicts with state law. "When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn.Stat. § 645.16. And under the language of the statute, because Minn.Stat. § 504B.177(a) does not conflict with any federal statute, regulation, or guidebook, respondent is required to comply with the eight-percent limit on late fees.

---

**3.** The broad definition of "conflict" applied by the court in *Kuhlman,* which related to a local traffic ordinance, is not instructive given the court's exclusive reliance on cases relating to traffic ordinances as well as the Minnesota Highway Traffic Regulation Act's "emphasis on uniformity and statewide application." *Kuhlman,* 722 N.W.2d at 4–6.

Even if we were to conclude that Minn.Stat. § 504B.177(a) conflicts with federal law, respondent's late-fee provision does not comply with the federal "reasonableness" standard for lease terms as required by paragraph (b). *See* 42 U.S.C. § 1437d(*l*)(2); Minn.Stat. § 504B.177(b). In determining whether a penalty for nonperformance of a contract is an unacceptable penalty, the "controlling factor" is whether the amount is reasonable "in the light of the contract as a whole, the nature of the damages contemplated, and the surrounding circumstances." *Gorco Constr. Co. v. Stein*, 256 Minn. 476, 482, 99 N.W.2d 69, 74 (1959). HUD's guidebook states that, under the federal reasonableness standard, "[i]f a [lease] term is found to be unfair, then that term will not be binding." *Public Housing Occupancy Guidebook, supra*, at 190. Appellant's monthly rent is $50, based on his monthly income of $203. The monthly late fee was equal to 50% of appellant's rent. In light of the contract as a whole and the surrounding circumstances, the late-fee penalty imposed by respondent was unreasonable and therefore not in compliance with the federal standard.

## DECISION

Because Minn.Stat. § 504B.177(a) does not conflict with any federal statute, regulation, or guideline, respondent was required to comply with the statute's provision prohibiting the imposition of late fees exceeding eight percent of a tenant's overdue rent payment. Because appellant's monthly rent was $50, the three $25 late fees imposed by respondent were invalid. And because there would have been no legal basis for eviction had respondent complied with Minn.Stat. § 504B.177(a), we reverse.

**Reversed.**