TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 93-302 |
| of | : | |
| | : | September 10, 1993 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY S. Da VIGO | : | |
| Deputy Attorney General | : | |
| | : | |

THE BOARD OF ADMINISTRATION OF THE CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM has requested an opinion on the following question:

Is the California legislation precluding investment of state trust moneys in business firms or financial institutions which participate in or comply with the Arab League's economic boycott against Israel preempted by the United States Export Administration Act?

CONCLUSION

The California legislation precluding investment of state trust moneys in business firms or financial institutions which participate in or comply with the Arab League's economic boycott against Israel is preempted by the United States Export Administration Act.

ANALYSIS

Government Code sections 16649.80-16649.95[1] were enacted in 1992 (Stats. 1992, ch. 1351, § 2) to prohibit the investment of certain funds in companies complying with the economic boycott of Israel by the Arab League. Specifically, on and after January 1, 1994, "state trust moneys"[2] may not be used to make investments in business firms or financial institutions that engage in discriminatory business practices in furtherance of or in compliance with the Arab League's

---

[1]All undesignated statutory references are to the Government Code.

[2]"State trust moneys" are defined as "funds administered by the Public Employees' Retirement Fund, the Legislators' Retirement Fund, the State Teachers' Retirement Fund, the Judges' Retirement Fund, the Volunteer Firefighter Fund . . . ." (§ 16649.80, subd. (f).)

economic boycott. (§§ 16649.81, 16649.83.)[3] The prohibitions do not apply to any business firm or financial institution which adopts a policy not to expand existing or engage in new discriminatory practices in furtherance of or in compliance with[4] the boycott. (§§ 16649.82, 16649.84, 16649.86.) For purposes of the foregoing, the term "discriminatory business practices" refers to arrangements

---

[3]Section 16649.81 states:

> "On or after January 1, 1994, state trust moneys shall not be used to make additional or new investments or to renew existing investments in business firms that engage in discriminatory business practices in furtherance of or in compliance with the Arab League's economic boycott of Israel."

Section 16649.83 states:

> "On or after January 1, 1994, state trust moneys shall not be used to make additional or new investments in financial institutions that engage in discriminatory business practices in furtherance of or in compliance with the Arab League's economic boycott of Israel."

[4]"`Compliance with the Arab League's economic boycott of Israel' means taking any action, with respect to the boycott of Israel by Arab countries, which is prohibited by the United States Export Administration Act of 1979 . . . ." (§ 16649.80, subd. (i).)

prohibited by sections 16721[5] and 16721.5[6] of the Business and Professions Code. (§ 16649.80, subd. (e).)

The present inquiry is whether the state statutes described above are preempted by federal law. On March 27, 1993, the President of the United States signed into law House Bill No. 750, reviving and extending through June 30, 1994, the Export Administration Act of 1979 (50 U.S.C. Appx §§ 2401-2420; hereafter "Act"). The Act prohibits any "United States person"[7] from taking the following actions with the intent to comply with, further, or support any boycott fostered or

---

[5]Business and Professions Code section 16721 provides in part:

"(a) No person within the jurisdiction of this state shall be excluded from a business transaction on the basis of a policy expressed in any document or writing and imposed by a third party where such policy requires discrimination against that person on the basis of the person's sex, race, color, religion, ancestry, or national origin, or on the basis that the person conducts or has conducted business in a particular location.

"(b) No person within the jurisdiction of this state shall require another person to be excluded, or be required to exclude another person, from a business transaction on the basis of a policy expressed in any document or writing which requires discrimination against such other person on the basis of that person's sex, race, color, religion, ancestry, or national origin, or on the basis that the person conducts or has conducted business in a particular location."

[6]Business and Professions Code section 16721.5 provides in part:

"It is an unlawful trust and unlawful restraint of trade for any person to do the following:

"(a) Grant or accept any letter of credit, or other document which evidences the transfer of funds or credit, or enter into any contract for the exchange of goods or services, where the letter of credit, contract, or other document contains any provision which requires any person to discriminate against or to certify that he, she, or it has not dealt with any other person on the basis of sex, race, color, religion, ancestry, or national origin, or on the basis of a person's lawful business associations.

"(b) To refuse to grant or accept any letter of credit, or other document which evidences the transfer of funds or credit, or to refuse to enter into any contract for the exchange of goods or services, on the ground that it does not contain such a discriminatory provision or certification."

[7]"United States person" is defined in the Act as follows:

"`United States person' means any United States resident or national (other than an individual resident outside the United States and employed by other than a United States person), any domestic concern (including any permanent domestic establishment of any foreign concern) and any foreign subsidiary or affiliate (including any permanent foreign establishment) of any domestic concern which is controlled in fact by such domestic concern, as determined under regulations of the President." (50 U.S.C. Appx § 2415 (2).)

imposed by a foreign country against a country which is friendly to the United States and which is not itself the object of any form of boycott pursuant to United States law or regulation:

"(A) Refusing, or requiring any other person to refuse, to do business with or in the boycotted country, with any business concern organized under the laws of the boycotted country, with any national or resident of the boycotted country, or with any other person, pursuant to an agreement with, a requirement of, or a request from or on behalf of the boycotting country. The mere absence of a business relationship with or in the boycotted country with any business concern organized under the laws of the boycotted country, with any national or resident of the boycotted country, or with any person, does not indicate the existence of the intent required to establish a violation of regulations issued to carry out this subparagraph.

"(B) Refusing, or requiring any other person to refuse, to employ or otherwise discriminating against any United States person on the basis of race, religion, sex, or national origin of that person or of any owner, officer, director, or employee of such person.

"(C) Furnishing information with respect to the race, religion, sex, or national origin of any United States person or of any owner, officer, director, or employee of such person.

"(D) Furnishing information about whether any person has, has had, or proposes to have any business relationship (including a relationship by way of sale, purchase, legal or commercial representation, shipping or other transport, insurance, investment, or supply) with or in the boycotted country, with any business concern organized under the laws of the boycotted country, with any national or resident of the boycotted country, or with any other person which is known or believed to be restricted from having any business relationship with or in the boycotting country. Nothing in this paragraph shall prohibit the furnishing of normal business information in a commercial context as defined by the Secretary.

"(E) Furnishing information about whether any person is a member of, has made contributions to, or is otherwise associated with or involved in the activities of any charitable or fraternal organization which supports the boycotted country.

"(F) Paying, honoring, confirming, or otherwise implementing a letter of credit which contains any condition or requirement compliance with which is prohibited by regulations issued pursuant to this paragraph, and no United States person shall, as a result of the application of this paragraph, be obligated to pay or otherwise honor or implement such letter of credit." (50 U.S.C. Appx § 2407 (a).)[8]

Federal law may preempt state or local law in various ways. Most directly, state law may be preempted by an express statement to that effect by Congress. (*California* v. *ARC America Corp.* (1989) 490 U.S. 93, 100; *Hillsborough County, Fla.* v. *Auto. Med. Labs.* (1985) 471 U.S. 707, 713.) Here, the Act contains such an express preemption provision:

"The provisions of this section and the regulations issued pursuant thereto shall preempt any law, rule, or regulation of any of the several States or the District

---

[8]This would, of course, encompass the Arab League's economic boycott against Israel.

of Columbia, or any of the territories or possessions of the United States, or of any governmental subdivision thereof, which law, rule, or regulation pertains to participation in, compliance with, implementation of, or the furnishing of information regarding restrictive trade practices or boycotts fostered or imposed by foreign countries against other countries." (50 U.S.C. Appx § 2407 (c).)[9]

Does the California legislation in question pertain "to participation in, compliance with, implementation of, or the furnishing of information regarding restrictive trade practices or boycotts fostered or imposed by" the Arab League against Israel? In our view, the state statutes plainly do so pertain, in that they specifically identify such conduct as the basis for the withholding of investment funds.

However, not every action taken by a state in a federally protected area is "regulatory" in nature and thus subject to federal preemption. In *Building Trades v. Associated Builders* (1993) __ U.S. __ [122 L.Ed. 2d 565], the question was whether the enforcement of a privately negotiated collective bargaining agreement by a state agency, acting as the owner of a construction project, was preempted by the National Labor Relations Act. The court analyzed the issue as follows:

"When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a state from regulating within a protected zone . . . . A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as *purchaser* should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction. See, e.g., *Maryland* v. *Louisiana* [(1981) 451 U.S. 725, 746] (`Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state Law')." (Id., at pp. 575-579.)

_____

[9]When the federal legislation does not contain an express preemption provision, federal preemption is not lightly presumed (*California Federal Sav. & Loan Ass'n* v. *Guerra* (1987) 479 U.S. 272, 281; *Maryland* v. *Louisiana* (1981) 451 U.S. 725, 746; *Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117, 132), particularly in areas traditionally regulated by the states and their political subdivisions (*San Diego Building Trades Council* v. *Garmon* (1959) 359 U.S. 236, 244; *Board of Trustees* v. *City of Baltimore* (Md. 1989) 562 A.2d 720, 741).

The court noted that whether a state may act as a proprietor without restriction of the preemption doctrine was left undecided in the case of *Wisconsin Department of Industry v. Gould, Inc.* (1986) 475 U.S. 282. (Id., at p. 577.)[10] The court commented on the *Gould* decision as follows:

"The conduct at issue in Gould was a state agency's attempt to compel conformity with the NLRA. Because the statute at issue in Gould addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations, we concluded: `Wisconsin "simply is not functioning as a private purchaser of services," . . . [and therefore] for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation.' [Citation.]" (Ibid.)

Similarly here the suggestion that California is acting as a proprietor in enacting sections 16649.80-16649.95 may not be sustained. The state statutes are clearly "tantamount to regulation" and policy-making. Specifically, the proscribed conduct in question, i.e., a company's participation in or compliance with the Arab League's boycott, is unrelated to the company's safety or performance potential for the investment of funds, and no purpose other than the deterrence of such unlawful participation or compliance could credibly be ascribed to the statutory scheme. Indeed, the Legislature has expressed its objectives in enacting the legislation as follows:

"(a) Since 1948, the Arab League has maintained a primary boycott against the State of Israel, requiring member Arab states to refrain from doing business with Israel.

"(b) Since the early 1950's, the members of the Arab League have committed discriminatory business practices by maintaining both a secondary and tertiary embargo against Israel, preventing members Arab states from doing business with third parties that trade with or invest in Israel.

"(c) The boycott seeks to coerce American firms by blacklisting those that do business with Israel.

"(d) The discriminatory business practices embodied in the Arab League's economic boycott of Israel were made illegal in California with the enactment of Section 16721 and 16721.5 of the Business and Professions Code by Chapter 1247 of the Statutes of 1976.

"(e) The United States has a longstanding policy opposing the Arab League boycott and United States law prohibits American companies from providing information to the Arab League or its member states to demonstrate compliance with the boycott.

---

[10]In *Gould*, the court rejected the argument that Wisconsin was acting as a proprietor when it refused to do business with persons who had violated the NLRA, stating:

"... the debarment statute serves plainly as a means of enforcing the NLRA. The state concedes, as we think it must, that the point of the statute is to deter labor law violations . . . . No other purpose could credibly be ascribed. . . ." (*Wisconsin Department of Industry v. Gould, Inc., supra*, 475 U.S. at 287.)

"(f)   The Arab League's Central Boycott Office has been located in Damascus, Syria since 1951.

"(g) As part of their boycott against Israel, Arab League countries refuse to accept passports from United States diplomats and citizens if they have an Israeli entrance stamp.

"(h) The Arab League embargo against Israel greatly hinders the Middle East peace process and regional stability, to which the United States is committed.

"(i) The lifting of the Arab League embargo against Israel would provide a gesture of good faith and build confidence between the Arab states and Israel, greatly enhancing the prospects for an Arab-Israeli peace." (Stats. 1992, ch. 1351, § 1.)

It is readily perceived from the Legislature's goals and objectives that sections 16649.80-16649.95 pertain to participation in or compliance with a foreign boycott and are patently regulatory.  The principles of federal preemption prevent states not only from setting forth standards of conduct inconsistent with the substantive requirements of federal law, but also from providing their own regulatory or judicial remedies for conduct prohibited by federal law.  (*Wisconsin Department of Industry v. Gould, Inc., supra*, 475 U.S. at 286-287.)  Here, the Act expressly and specifically prescribes the remedies for violations of its terms.  (50 U.S.C. Appx § 2410.)

It is concluded that the California legislation precluding investment of state trust moneys in business firms or financial institutions which participate in or comply with the Arab League's economic boycott against Israel is preempted by the United States Export Administration Act.

\* \* \* \* \*